The MAGNOLIA GROUP, Etc., Plaintiff/Appellee,

v.

The METROPOLITAN DEVELOPMENT AND HOUSING AGENCY OF NASHVILLE, DAVIDSON COUNTY, Tennessee, Defendant/Appellant.

Court of Appeals of Tennessee, Western Section, at Nashville.

Sept. 8, 1989.

Application for Permission to Appeal Denied by Supreme Court Jan. 2, 1990.

George E. Barrett, Nashville, for defendant/appellant.

Hugh C. Howser, Trabue, Sturdivant & DeWitt, Nashville, for plaintiff/appellee.

TOMLIN, Presiding Judge (Western Section).

The Metropolitan Development and Housing Agency of Nashville, Davidson County, (hereafter "MDHA") appeals from a judgment of the Chancery Court for Davidson County wherein summary judgment was entered in favor of plaintiff, The Magnolia Group (hereafter "Magnolia"), owners and developers of a low-rent housing project in Davidson County. Magnolia brought this action against MDHA charging that it had breached the contract between the parties by attempting to reduce the amount of housing payments paid to Magnolia. The sole issue presented by this appeal is whether or not the chancellor erred in granting summary judgment. We hold he did not and affirm.

Magnolia is a private landowner and developer in Davidson County. MDHA is the local government agency that administers a nationwide federally-funded program in Davidson County under the auspices of the Department of Housing and Urban Development (hereafter "HUD"). The program is designed to provide affordable housing to low income families. The housing program in which Magnolia sought to become involved with MDHA is one funded entirely by the United States Government through monies appropriated by Congress and dispersed by HUD. HUD has promulgated extensive regulations governing the participation and administration of the program.

When a program such as this is put into effect with a local agency, the procedure is for HUD to enter into what is called "Annual Contributions Contracts" ("ACC's") with such an agency in order to provide funds for the agency to make housing assistance payments to participating property owners on behalf of eligible tenants. The Housing Assistance Payment represents the difference between the actual rent charged by the landowner and that amount attributed to the tenant himself/herself. Sometime in 1983, Magnolia began negotiations with MDHA with reference to the rehabilitation of rental units owned by it in Nashville.

Upon the successful conclusion of these negotiations, Magnolia and MDHA entered into a contract entitled "Agreement to Enter Into Housing Assistance Payments Contract", referred to as "AHAP." The AHAP was signed by the parties and became effective on February 2, 1983. The AHAP consisted of the agreement itself as well as certain exhibits, among which were Exhibit "C," containing the cost estimate and presupposed base and contract rents and Exhibit "D," a copy of the HAP contract, which was not fully completed at that time. Page one of the AHAP provided: "This agreement, including the exhibits comprises the entire agreement between the PHA and Owner."

Following the execution of the AHAP, Magnolia undertook the rehabilitation of the seventeen-unit apartment project covered by the contract. After the rehabilitation was completed the project was inspected by MDHA and the rehabilitation accepted. Following the completion and acceptance, the parties signed the "Housing Assistance Payments Contract" (hereafter "Contract" or "HAP Agreement") effective September 1, 1983. This Contract consisted of an eight-page document with certain exhibits which identified the units by size and applicable rents ("Contract and Base Rents").

Another exhibit with which we are not concerned delineated the services, maintenance and utilities to be furnished by Magnolia. It is important to note that § 1.21 of the HAP Contract provides that: "This Contract, including the exhibits, comprises the entire agreement between the parties with respect to the matters contained in it."

Beginning with the effective date of the Contract—September 1, 1983—Magnolia began to receive Housing Assistance Payments from MDHA pursuant to the Contract provisions. The parties operated in this manner until November 26, 1985, when the Director of Rental Assistance for MDHA wrote a letter to a partner of Magnolia, advising that effective January 1, 1986 Magnolia's Contract rents would be reduced. The letter read in pertinent part as follows:

> Based on a HUD Coordinated Review of the Section 8 Moderate Rehabilitation Program that was completed September 12, 1984, the file on the above referenced unit reflected significant overpayments.
>
> . . . .
>
> These contract rents include all approvable annual adjustments to date. The justification for the rent reduction is contained in Section 1.5(a)(5) of the HAP Agreement (Copy attached).

Negotiations between the parties were unsuccessful and this suit followed. Following the filing of this suit in Chancery Court for Davidson County, MDHA filed a petition to remove this case to the U.S. District Court. Later, upon motion by Magnolia, the case was remanded to Davidson County Chancery. Included in that remand was a denial of MDHA's motion to join HUD as a necessary party. While the case was pending in the United States District Court, MDHA filed its answer to Magnolia's complaint. The only affirmative defense raised by MDHA in its answer was that the HAP agreement provided for HUD's periodic auditing of Section 8 Housing as set forth in Sections 1.5(e)(2)(i) and 1.11(a) and (b) of the HAP Agreement, and that it was pursuant to these sections that HUD audited plaintiff and directed MDHA to adjust the rents.

Magnolia filed its motion for summary judgment based upon the pleadings, answers to interrogatories, and the sworn affidavit of one of its partners. MDHA opposed the motion based upon an affidavit of the Director of Rental Assistance and certain exhibits.

In granting summary judgment, the chancellor found that there was no genuine issue as to any material fact in dispute as to whether MDHA could reduce the Contract rents below what they were on the effective date of the Contract, noting that Section 1.6(a)(1)(iii) entitled "Rent Adjustments of the HAP Contract" provided as follows: "Contract Rent(s) may be adjusted upward or downward, as may be appropriate. However, in no case may the adjusted Contract Rent(s) be less than the Contract Rent(s) on the effective date of the Contract except as provided in Section 1.6(b)." [1]

In oral argument before this Court, counsel for MDHA conceded that the success of his appeal rested primarily, if not solely, upon the premise that the AHAP and HAP Agreements were to be treated in *para materia* and were to be in essence considered as one agreement. From a reading of this record, we can understand the desire of counsel to have this Court so treat the agreements, but by the same token the record clearly dissuades us from doing so. The AHAP Contract appears to be the only contract in existence between the parties from February 2, 1983 until such time as the rehabilitation of the units was completed. "When the rehabilitation is completed, the Owner and the PHA will enter into a Housing Assistance Payments Contract ('*Contract*')." While the HAP Contract was an exhibit to the AHAP Contract, it seems clear that this was done for the purpose of establishing a meeting of the minds between the parties as to the basic terms of that Contract so that no further negotiations other than a resolution of the

---

**1.** Section 1.6(b) refers to vacancies in the project and is in no way involved in the issues before us.

Rents and a few other minor details would need to be worked out when the rehabilitation was completed. An examination of the two contracts side by side indicates clearly that the obligations of the parties under the respective contracts were totally different.

Furthermore, there are no provisions in the AHAP Contract to dictate that, upon the execution of the HAP Contract, the AHAP Agreement would "merge" into the HAP Contract. By the same token, there are no provisions in the HAP Contract to indicate that the first agreement, the AHAP Contract, was to be incorporated into the HAP Contract. To the contrary, the HAP Contract clearly states that "This Agreement ... comprises the entire agreement between the PHA and Owner."

According to the doctrine of merger in this state, the general rule is that the last agreement concerning the same subject matter that has been signed by all parties supersedes all former agreements, and the last contract is the one that embodies the true agreement. *Bringhurst v. Tual*, 598 S.W.2d 620 (Tenn.App.1980); 7 Tenn. Jurisprudence *Contracts* § 64 (1983). While these two contracts deal "with the same subject"—a rental housing project—they deal with two totally different aspects of the same subject. The first, the AHAP Agreement, deals with the method and manner of rehabilitation of the project and matters related to the rehabilitation work; i.e., removal of tenants, construction, costs and financing. The HAP Contract contemplates the *operation* of the project as a renovated housing development and deals with such matters as Housing Assistance Payments, adjustments in rent, vacancies, maintenance operation and inspection of the project, and the like. We are also compelled to note that no authority is cited by MDHA in support of its position that the AHAP is incorporated and is to be considered a part of the HAP Contract.

A very obvious reason for the efforts of MDHA to attempt to make Siamese twins out of these two independent contracts is that the contract provision relied upon by MDHA as justification for the rent reduction is found not in the HAP Agreement, as MDHA's mandate to Magnolia so stated, but in the AHAP Agreement. MDHA identified it as "Section 1.5(a)(5)."

There is no "1.5(a)(5)" in the HAP Contract. There is a "1.5," but it deals with Housing Assistance Payments and is totally irrelevant to the issue here. Turning to the AHAP Agreement, we find that Section 1.5 is entitled, "Rehabilitation Period." Subsections (a) and (5) put together read as follows:

(a) *Changes.* Contract Rents as set forth in Exhibit C will be the Contract Rents on the effective date of the Contract except under the following circumstances when approved by the PHA under paragraph (b).

. . . .

(5) When necessary to conform with the HUD prescribed procedures for calculating Base and Contract Rents.

We continue quoting for the sake of clarity and illumination:

(b) *PHA's Responsibilities in Approving Changes.* Prior to execution of the Contract[2] the PHA must review and approve the Owner's certification of rehabilitation costs, temporary relocation costs, and interest rate and term of the financing on which the Contract Rents are to be based. In addition, when there is a change between the rents specified in Exhibit C and those to be inserted in the Contract:

. . . .

(2) If the change is due to circumstances set out in paragraphs (a)(2), (a)(3), (a)(4), or (a)(5) of this section (*either an increase or decrease*), the PHA will recalculate, in accordance with HUD procedures, the Contract Rents specified in Exhibit C for inclusion in the Contract.

While there is sufficient reason to conclude that the above-quoted language refers to that period of time *prior to* the execution of the HAP Agreement, a reading of 1.5(a)(5) in conjunction with (b)(3) of the

---

**2.** The descriptive term for the HAP.

same section clearly spells out that all this is to take place during the rehabilitation period and before the execution of the HAP Agreement. In an effort to put this in simpler language, these provisions contemplate that under the circumstances described therein, MDHA was to recalculate the Contract Rents, if necessary, and insert them in the HAP Agreement "prior to the execution of the Contract." To the same effect see 24 CFR § 882.408(d)(1)(v) and (2).

As found by the chancellor, not only does the HAP Contract prohibit the reduction of the Contract Rents to an amount less than the Contract Rents on the effective date of the Contract, but the HUD regulations are to the same effect. 24 CFR § 882.508 reads in part as follows:

**Execution of housing assistance payments contract.**

(a) *Time of execution.* Upon PHA acceptance of the unit(s) and certifications pursuant to § 882.507, the Contract will be executed by the Owner and the PHA. The effective date must be no earlier than the PHA inspection which provides the basis for acceptance as specified in § 882.507(e).

(b) *Changes from Agreement.* The Contract Rents may be higher or lower than those specified in the Agreement in accordance with requirements of § 882.408(d).

For the first time, on appeal to this Court, MDHA raises this, its second, issue:

B. Even if the AHAP does survive the HAP Contract, whether the Supremacy Clause of the United States Constitution requires that Tennessee contract law be suspended so that the congressional intent that rental adjustments be made shall be preserved?

By this issue MDHA attempts to seek relief under the Supremacy Clause of the U.S. Constitution.

First of all, we believe that in essence MDHA in its oral argument before this Court MDHA waived this issue. Nonetheless, we hasten to point out that in our opinion, this issue is without merit. First of all, we have concluded that AHAP does not survive the HAP Contract, but that

HAP Contract is the controlling and only Contract. We find no existence of any Tennessee law that should be superseded by federal law, for the federal law in the form of federal regulations, the CFR, includes the same prohibition against the reduction of rents to an amount less than the rents on the date of the Contract as found in the Contract itself. We find no basis for an insistence that a Supremacy question is involved and accordingly hold that this issue is without merit.

Accordingly, the decree of the chancellor below is in all matters and things affirmed. Costs in this cause are taxed to MDHA, for which execution may issue if necessary.

FARMER, J., and NEARN, Ret. J., concur.