IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 1999 Session

## DORIS JEAN TIPTON v. ELIZABETH QUINN

**Appeal from the Chancery Court for Sumner County**
**No. 95C-338   Tom Gray, Chancellor**

---

**No. M1998-00951-COA-R3-CV - Filed March 28, 2001**

---

This is a breach of contract case involving agreements for Defendant to board and breed Plaintiff's horses for a share of the resulting foals. Shortly after the parties entered into an oral agreement, Defendant memorialized the agreement in a handwritten note. The agreement was subsequently reduced to more detailed writings by Plaintiff, which both parties signed. Plaintiff later claimed that Defendant breached portions of the agreement which required her to timely breed the mares, provide insurance, adequately care for and maintain the horses, provide adequate veterinary care for the horses, allow inspection of the horses, and halter-break foals. Defendant claimed that the agreement prepared by Plaintiff did not reflect the parties' original oral contract. The trial court granted Plaintiff partial summary judgment on the portion of her breach of contract claim alleging that Defendant failed to obtain insurance. After a bench trial, the court awarded Plaintiff compensatory damages for breach of contract as well as attorney's fees. Defendant appeals those decisions. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which William C. Koch, Jr., and WILLIAM B. CAIN, JJ., joined.

Tony L. Maples, Nashville, Tennessee, for the appellant, Elizabeth Quinn.

C. Edward Scudder, Jr., Nashville, Tennessee, for the appellee, Doris Jean Tipton.

### OPINION

This case involves a dispute between Ms. Tipton, the owner of several horses, and Ms. Quinn, who agreed to board and breed five of Ms. Tipton's mares. The basic arrangement, subject to individual exceptions, was that Ms. Quinn would receive the first foal from each mare in consideration for the boarding and other services, and Ms. Tipton would get the second foal.

This arrangement began in June 1994 after Ms. Tipton and Ms. Quinn made an oral agreement. The five mares were identified as Touch of Class, Khemoshen, Rozyczna (Roxy), Ansa Pierkimsey (Ansa) and Lancers Shamia. Ms. Quinn took possession of Khemoshen, Roxy, and Ansa on June 7, 1994. She received Touch of Class and her 1994 foal DDT Sassi Classi within the month and Lancers Shamia in August 1994.

On June 17, 1994, Ms. Quinn drafted a handwritten document memorializing the oral agreement. The notation listed the names of a number of horses, some of which do not appear to be involved in this lawsuit. It then stated in pertinent part:

> Raise the the [sic] filly and bring back when mare comes back. On both
> above mares [referencing, in part, Touch of Class and her new foal]. 3 mares
> – Khemoshen - Roxy - Ansa –Liz [Ms. Quinn] has first foal bred to my choice
> stallion. Keep the mare a second year bred to stallion of D.J. Tipton's choice
> & halter break & worm and return at weaning time. All vet bills to be paid
> by leasee [sic] [Ms. Quinn] of mares . . .

Both Ms. Quinn and Ms. Tipton signed this handwritten memorandum as well as having it witnessed. Ms. Quinn testified that she understood that under this agreement she was to provide transportation of the horses, along with their veterinary care, feed, shots and worming. The parties agree that on all of the mares except Lancers Shamia, Ms. Quinn was to get the first foal and then the mare would be bred again with Ms. Tipton getting the second foal.[1]

Ms. Quinn admitted that she and Ms. Tipton agreed that Ms. Tipton would provide a future written contract and that "there would be a few other little things" in the agreement. She testified that:

> We just left it at that, because a few other little things -- those things weren't
> anything to me, and they were not printed yet, and she was saying it was
> going [to] take time. And I said send it when you get it ready.

The agreement Ms. Tipton subsequently drafted took the form of five "conditional lease agreements." Each agreement related to one of the mares at issue. Ms. Tipton testified she sent Ms. Quinn these contracts in October of 1994 and Ms. Quinn refused to sign them. They were sent again and, at some point, the two entered into negotiations about the terms of these agreements. Ms. Quinn specifically mentioned negotiation on such things as transporting mares to horse shows and the

---

[1] It is not disputed that neither Ms. Quinn nor Ms. Tipton were to receive any foal from the mare Lancers Shamia, but Ms. Quinn signed the contract because the horse was to be kept on her farm while it was being bred for a third party. Ms. Quinn was, however, responsible for the feed and maintenance of the horse while on her property.

extent of her ability to train the horses.[2]  Ms. Quinn testified that she had a problem with the contracts "about putting in there things that really didn't have any bearing on  what we were trying to do," but she signed the contracts anyway in March or April, 1995.[3]  Ms. Tipton signed them on May 1, 1995.

Each conditional lease agreement included a paragraph setting the term of the agreement, which stated:

> The terms of this agreement shall be for [each agreement has a number inserted in this blank]  years having begun by a verbal agreement on or around June 1st, 1994[4] with possession of aforementioned horse going to leasee(s) [sic] at that time with the understanding the written agreement would be executed as soon as possible by both parties and being understood and agreed that the actual agreement shall have commenced with the verbal agreement . . .

Under all five of the agreements, Ms. Quinn was to provide, *inter alia*, adequate care and maintenance of the mares, all transportation costs, mortality insurance, access to the premises for inspection at any reasonable time or to remove the horse in the event Ms. Tipton felt their health or safety was in jeopardy, written proof of any and all medical treatment, written proof of breeding dates and a confirmation of pregnancy via sonogram within 90 days of conception.  The agreements also required Ms. Quinn to provide Ms. Tipton's foals with "basic skill knowledge (leading, standing when tied-off, bathing, clipping, allowing feet to be picked up for cleaning or trim, ECT [sic])."

The agreements all provided for Ms. Tipton to receive "all reasonable attorney fees, filing fees," and costs should any legal disputes arise; concluded with a provision stating that the contract constituted the entire agreement between the parties; and contained a liquidated damage provision in the event the horse(s) were returned to Ms. Tipton for any reason.

Ms. Tipton made her first visit to the Quinn property to inspect her mares on March 26, 1995. Ms. Tipton testified that during that visit, "I realized there was a problem, that Ms. Quinn was not doing what she said."  When asked to specify what she observed on that date, Ms. Tipton

---

[2]The evidence shows that Ms. Quinn read all of the contracts and was aware of their contents, including handwritten amendments to the printed agreements.  In addition, she had Ms. Tipton remove items from other contracts covering some stallions, issued and signed at the same time.

[3]Although Ms. Quinn testified she executed on April 22, 1995, the contracts state they were made March 15, 1995.

[4]The agreement for Touch of Class contained this same language but stated that the verbal agreement took place on June 5, 1994, rather than June 1.

testified that the mares and stallions in Ms. Quinn's possession at that time[5] were not being fed and cared for properly and were "nothing but dried hide stretched over the bone" and she was dissatisfied because Ms. Quinn purportedly told her earlier that two of the mares had not been bred, but after her visit Ms. Tipton believed that they had been bred.

Ms. Tipton filed the underlying action on November 13, 1995, alleging breach of contract, negligence, fraud, and conversion. The breach of contract claims were based on Ms. Quinn's purported failure to provide the agreed to transportation, veterinary care, proper board, care and maintenance, and notice of illness or trauma. The complaint also alleged that Ms. Quinn failed to obtain insurance, to timely return the horses when they were demanded, or to allow their peaceful retrieval by Ms. Tipton.[6] As relief, Ms. Tipton sought the immediate return of her horses, including their offspring, money damages on the tort and contract claims, and punitive damages.

Six months later, Ms. Tipton filed a motion for partial summary judgment on the contract claim, seeking immediate return of her horses and the imposition of a constructive trust with respect to any offspring born to the mares at issue. Ms. Tipton argued that the time for the return of the horses Touch of Class and Lancers Shamia as specified in the contracts had expired and that Ms. Quinn had further breached the contracts by failing to rebreed several of the mares and to allow inspection of the premises. In her response to the motion, Ms. Quinn admitted that she had not renewed the insurance policy "because prior to that date I have been sued and this matter is in court. Since the Plaintiff . . . has breached the contract, then I was not under further obligation to continue on due to said breach."

The trial court granted Ms. Tipton's motion for partial summary judgment on the ground that Ms. Quinn failed to renew the equine insurance as required under the contract. The court ordered Ms. Quinn to promptly return the five mares "together with all six of the foals born to any of the . . . mares while in possession of the Defendant."

Ms. Quinn moved to amend that order, asserting that Ms. Tipton claimed the order gave her title to all the foals when ownership of the foals remained at issue. Ms. Tipton responded that as of a month after the court's judgment, Ms. Quinn had failed to return any of the horses and was in breach, having admitted that she failed to maintain the insurance.

---

[5]Other arrangements, part of the dispute in the trial court but not on appeal, existed between the parties regarding some stallions.

[6]The claims of negligence, fraud and conversion were subsequently dismissed at the trial for lack of sufficient evidence, and that decision is not contested here. The negligence claim was based on Ms. Quinn's purported failure to provide the horses with adequate food, shelter, and veterinary care which purportedly led to the spread of communicable disease by returned horses among Ms. Tipton's other horses. The fraud claim alleged that Ms. Quinn attempted to fraudulently register a foal with the Arabian Horse Registry of America (AHRA) by forging Ms. Tipton's name on the registration papers. The conversion claim was based on Ms. Quinn's purported failure to timely return horses.

The trial court issued an amended order granting partial summary judgment to Ms. Tipton on her breach of contract claim alleging Ms. Quinn failed to provide the required insurance. The court ordered the return of Ms. Tipton's five mares and their six foals born in Ms. Quinn's possession. It also directed that the five mares and the two 1996 foals were to be titled solely in the names of Ms. Tipton or her daughter, Kelli, and held that Ms. Quinn had no ownership interest in those seven horses. On August 19, 1996, the five mares and their foals were turned over to Ms. Tipton.

Almost two years later, due to several continuances at the parties' request, a bench trial was held on the remaining claims. After hearing the evidence, the trial court awarded Ms. Tipton $28,932.70 in compensatory damages on the breach of contract claim, finding that Ms. Quinn failed to breed the mares as agreed, to permit inspection, and to provide adequate care and maintenance or veterinary care. The trial court also determined Ms. Quinn breached the contract by failing to notify Ms. Tipton when a foal died, by refusing to return the horses, and by failing to maintain insurance and halter-break foals. In addition, the trial court awarded Ms. Tipton $18,739.50 in attorney fees based on a provision in the conditional lease agreements. Ms. Quinn appeals from those rulings and from the trial court's award of $750 in attorney's fees to Ms. Tipton as a discovery sanction.

I. Breach of Contract

Ms. Quinn argues that the trial court erred in finding her in breach. She maintains that only the initial oral contract and the handwritten memorandum memorializing that agreement were binding because the subsequent, written leases lacked additional consideration. In part, this issue of whether the five conditional lease agreements were binding was the subject of Ms. Tipton's successful motion for partial summary judgment. In ruling on that motion, the trial court found that Ms. Quinn breached the contract by failing to renew the equine insurance as required, an obligation imposed only by the written conditional lease agreements.

Because the trial court's determination on summary judgment that Ms. Quinn had breached the agreements by failing to maintain the required insurance was based on Ms. Quinn's own response, there was no issue of material fact regarding compliance with the agreements, and the court's grant of partial summary judgment was purely a question of law. Accordingly, our review of the issue decided in that procedural posture is *de novo* with no presumption of correctness. *Sullivan v. Baptist Mem. Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999); *Tullahoma v. Bedford County,* 938 S.W.2d 408, 412 (Tenn. 1997).

In addition, after the bench trial, the trial court found that Ms. Quinn had also breached the contracts in the following ways:

> She did not breed the mares as she agreed; she did not comply with the contract terms as to the right of the owner, Doris Jean Tipton, to make inspections. She did not at her own expense provide adequate quality and quantity of feed, water, nutrients, shelter, care and maintenance and

-5-

veterinary care, and attention and for the horse hereby leased and any get or increase (foals) thereof. Bi-monthly information as required by individual contracts was not provided by defendant to plaintiff. When a foal of Lancers Shamia died, defendant did not notify pursuant to the contract the plaintiff.

These findings make it clear that the trial court found, as a matter of law, that Ms. Quinn was bound to the lease agreements. We agree with the trial court's determination that the five conditional lease agreements were binding on Ms. Quinn and enforceable against her.

The doctrine of merger provides that "the last agreement concerning the same subject matter that has been signed by all parties supersedes all former agreements, and the last contract is the one that embodies the true agreement." *Magnolia Group v. Metropolitan Dev. & Housing Agency,* 783 S.W.2d 563, 566 (Tenn. Ct. App. 1989). A conclusive presumption that the writing represents the parties' final agreement arises after the parties have reduced their agreement to a clear and unambiguous written contract. *Faithful v. Gardner*, 799 S.W.2d 232, 235 (Tenn. Ct. App. 1990). Consequently, all parol agreements on the same subject matter are deemed merged with the contract as written. *Id.*

Without question, each of the successive agreements involved in this case covered the same subject matter, the leasing, breeding, and boarding of specific horses. *Southwest Progressive Enter., Inc. v. Shri-Hari Hospitality, LLC,* No. 01A01-9810-CH-0542, 1999 WL 675136 at *4 (Tenn. Ct. App. Sept. 1, 1999) (no Tenn. R. App. P. 11 application filed). Further, where, as here, there is evidence that the parties contemplated finalizing their agreement in a formal writing, application of the merger doctrine is appropriate. *Turner v. Zager*, 50 Tenn. App. 674, 685, 363 S.W.2d 512, 517 (1962). Ms. Quinn testified that she knew the written agreements would be forthcoming when Ms. Tipton got them ready.

Moreover, it is well settled that we must interpret contracts according to their plain terms. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). The integration clause in each of the lease agreements states:

This constitutes the entire agreement between the parties herein and is non-transferrable and non-assignable and shall be binding for and upon the parties hereto, thier [sic] heirs, executors, administrators, legatees, successors, and assigns.

This clause, along with the clause stating that each lease began by the earlier verbal agreement, clearly reflect an intent for the final contract to encompass the parties' total agreement. "This clause is not meaningless. By signing this contract both parties agreed that the written lease would set forth their final agreement." *Brookside Mills, Inc. v. Specialty Retail Concepts, Inc.*, (no case number given) 1987 WL 26206 at *4 (Tenn. Ct. App. Dec. 8, 1987) (no Tenn. R. App. P. 11 application filed). Thus, we must conclude that any prior agreements between the parties merged into the executed conditional lease agreements written by Ms. Tipton which both parties executed.

We note, in this respect, that several of the agreements include handwritten notations reflecting events in December 1994, January 1995 and March 1995, all before the contracts were executed by the parties, which resulted in changes to the agreements as originally drafted. For example, the agreement regarding the mare Ansa has a notation dated March 15, 1995 that "Leasee [sic] states she did not get mare bred in 1994 by her choice Leasor(s) [sic] agree to forward this agreement one year."

Having determined that the written agreements Ms. Quinn executed were binding, we must consider whether the trial court erred in finding that Ms. Quinn breached their terms.[7] As noted above, it is undisputed that Ms. Quinn failed to maintain insurance on the horses as the agreements mandated. *See* Tenn. R. Civ. P. 56.04. Thus, the trial court did not err in granting partial summary judgment on that ground. Because the remainder of this case was heard in a bench trial, we review findings made after trial *de novo,* with a presumption of correctness attaching to the trial court's findings of fact. *See* Tenn. R. App. P. 13(d).

Turning to these findings, the agreements required Ms. Quinn to provide "adequate quality and quantity of feed, water, nutrients, shelter, care, and maintenance, and Veterinary care" to each mare and foal, all in accordance with good husbandry, including specific procedures to suppress parasites and injections to prevent disease. In addition, Ms. Quinn was required to provide written proof of all medical treatment, and to provide records of regular health care every 60 days, along with photographs or videos of the horses.[8] She agreed to notify Ms. Tipton "within two hours of any accident, injury or illness" affecting the horses "followed within seventy-two (72) hours by postage pre-paid, certified mail, a written statement by a licenced [sic] veterinarian of the diagnosis and prognosis of said horse(s)." The agreements required that proof in writing of breeding dates be provided within ninety days of conception.

Ms. Tipton testified that Ms. Quinn failed to notify Ms. Tipton when a foal died, when several of the mares were bred and also failed to provide timely reports of the horses' conditions. In addition, Ms. Tipton testified that the horses were underfed and presented photographs showing their condition upon their return to her possession. Ms. Tipton also testified that she was not permitted to inspect the horses, contrary to the Ms. Quinn's grant to her in the agreements of "the right to enter upon the premises at any reasonable time without prior notice" to inspect the horses, foals, and Ms. Quinn's premises.

Ms. Quinn disputed some of the factual allegations against her, such as whether the horses received adequate feed, but she primarily defended her actions as either not required by the agreements or justified by prior breaches by Ms. Tipton. As the trier of fact, the trial court had the

_____

[7]We note that some of the duties Ms. Quinn was found to have breached are also part of the earlier oral agreement, memorialized in the handwritten memorandum, which Ms. Quinn herself asserts is binding.

[8]Regarding this obligation, the agreements specifically provided, "NO EXCEPTIONS WILL BE MADE! FAILURE TO PROVIDE THIS BI-MONTHLY INFORMATION AS PROVIDED FOR HEREIN SHALL BE CONSIDERED 'BREECH [sic] OF CONTRACT' TEN DAYS PAST DUE."

opportunity to observe the manner and demeanor of the witnesses as they testified. The weight given to a witness's testimony lies in the first instance with the trier of fact, and this court must accord great weight to the trier of fact's decisions on issues of credibility. *Mays v. Brighton Bank*, 832 S.W.2d 347, 352 (Tenn. Ct. App. 1992); *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 849 (Tenn. Ct. App. 1982). Having reviewed the record, we cannot say that the evidence preponderates against the trial court's findings that Ms. Quinn breached various provisions of the contracts.

## II. Damages for the Breach

The more problematic issue in this appeal is the proper calculation of damages. Ms. Quinn maintains that even if the contracts were breached, the damages were improperly calculated, specifically asserting that Ms. Tipton proved no damages arising from the alleged breaches. The trial court awarded Ms. Tipton $28, 932.70 in damages, but we find no specific findings regarding how the damages were calculated. Ms. Tipton testified regarding costs she had incurred due to the breach, such as boarding the mares for the unexpired terms of the agreements, and introduced as exhibits to her testimony five documents titled summary of damages, each one related to a specified mare. The language of the five agreements and the evidence at trial are difficult to reconcile, to interpret, and to apply regarding the damages due and the damages incurred. Therefore, a long explanation is required.

We begin with the language of the agreements, all of which contained a liquidated damages clause, which was not brought to the attention of the trial court or of this court and was not argued by the parties. Nonetheless, we cannot ignore that provision of the written agreements whose enforcement was strongly sought by Ms. Tipton, the drafter. We have held the agreements enforceable. The provision in question states:

> It is futher [sic] expressely [sic] understood and agreed if for any reason at any time during the contience [sic] of this agreement or any extension thereof HORSE(S) reverts to LEASOR(S) [sic] possession for any reason LEASOR(S) [sic] will be entitled to compensation in the cash sum of Two Thousand Dollars ($2000.00) per year for the life of the contract, payable on demand.

"Liquidated damages is defined by case law as a sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid to compensate for injures should a breach occur." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 96 (Tenn. 1999) (citations omitted). Liquidated damages clauses are legal and binding in Tennessee as long as they are not punitive in nature, are a reasonable estimate of the damages likely to be incurred, or are a reasonable estimate if damages are likely to be uncertain or hard to prove. *Id*.

In this case, Ms. Tipton drafted the agreements and included the liquidated damages provision. Therefore, any ambiguity in the terms of the agreements must be construed against her. *Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996); *Travelers Ins. Co. v.*

*Aetna Cas. & Sur. Co.*, 491 S.W.2d 363, 365 (Tenn. 1973). It must be assumed that she anticipated that the amount set as liquidated damages would be fair and adequate compensation in the event the horse(s) were returned to her for "any reason" during the terms of the contract. Further, her testimony regarding her costs for boarding and other expenses demonstrate that the $2000 per year was a reasonable estimate of the damages she would incur due to the early return of the mares.[9]

To some extent, the issue of damages must be considered in the context of the "benefit of the bargain" each expected from the arrangement. The agreements contemplated that Ms. Quinn's compensation for boarding and taking care of the mares was to be a foal from each mare except Lancers Shamia. Ms. Tipton was relieved of all costs associated with care and maintenance of the horses and was, in turn, to receive the second foal by each mare. These general statements of mutual obligation are subject to the specifics of each agreement, discussed below. We interpret the liquidated damages provision as applicable to any damages Ms. Tipton incurred because of the early return of the horses. We do not, however, consider it as determinative of the ownership of the foals which were born during Ms. Quinn's possession of the horses. Rather, we look to the terms of each agreement for guidance regarding each party's rights to the six foals which were awarded to Ms. Tipton.

The five mares and their six foals "reverted to Ms. Tipton's possession" in August 1996 as a result of her obtaining a court order for their return.[10] Therefore, according to the liquidated damages provision, Ms. Tipton's damages would be limited to $2000 per year, or $166.66 per month remaining in each of those contracts which were in effect at the time of the horses' return. Our reading of the contracts indicates that three were in effect at the time the horses were returned.

The lease agreement covering Ansa Pierkimsey (Ansa) had a term of 2-1/2 years, was to begin June 1, 1994, and end November 31, 1997, which we calculate to be 3-1/2 years. However, that discrepancy is explained by a handwritten notation dated 3-15-95 reflecting that because Ms. Quinn did not breed this mare in 1994, Ms. Tipton agreed to "forward" this agreement one year. The agreement originally contemplated a 1995 foal by a named stallion owned by Ms. Tipton, leased on a separate contract to Ms. Quinn for this purpose, with the mare to be rebred in 1995 to a stallion of Ms. Tipton's choice for a 1996 foal for Ms. Tipton. The amendment also provided that if the mare was not verified by a vet as being in foal by May 1, 1995, it was to be returned to Ms. Tipton.

Ms. Tipton testified that although Ms. Quinn told her on March 15 that Ansa had not been bred, Ms. Quinn filed an insurance application shortly thereafter indicating that the mare had been

---

[9]Ms. Tipton claimed $5.83 per day for board and upkeep for a mare or a foal, which is an annual cost of $2127.95.

[10]Ms. Quinn's argument that no damages resulted from the breaches found by the court ignores the return of three of the horses prior to the expiration of the term of the agreements. This return was ordered after Ms. Quinn admitted she did not have insurance coverage for Ms. Tipton's horses which were in her possession. The early return of the horses triggered the liquidated damages provision, which constituted an acknowledgment that such action would result in damages to Ms. Tipton.

bred in February. In any event, Ansa had a foal in 1995, and it was one of the six foals returned to Ms. Tipton in August of 1996. Ms. Tipton's testimony regarding damages indicates that she was entitled to two foals under the agreement regarding Ansa, and that she would consider the 1995 foal in her possession to be an offset to the 1996 foal due her.

Ms. Tipton also claimed $5000 in damages for the second foal she thought she was due which was not born. We are unable to find any obligation in the agreement for a second foal to Ms. Tipton. The only provision regarding another breeding relates to an option to renew the lease agreement for two years. The agreement provided that the mare would be rebred to a stallion of Ms. Tipton's choice if the option to renew was not exercised in the time allotted, resulting in the mare being returned with a foal *in utero*. The original term of the agreement was to expire in November 1997, and the option to renew was to have been exercised by August 31, 1997. Because the horse was returned a year before the time for exercising that option, the *in utero* provision is ineffective. Thus, we conclude that Ms. Tipton was entitled to only one foal from Ansa and was not entitled to any damages for another foal not produced.

Ms. Tipton also claimed daily board for the mare Ansa at $5.83 per day, for a total of $355.63 for October and November of 1996. Under the lease agreement, Ms. Quinn was obligated to provide board for the mare and the foal belonging to Ms. Tipton for the term of the contract, until November 30, 1997. Therefore, under the liquidated damages clause, Ms. Tipton would be entitled to $2000 per year for the time remaining on the contract, which we calculate to be $2500.

The agreement covering the mare Rozyczna (Roxy) is similar to the one covering Ansa. It also stated its term was 2-1/2 years, from June 1, 1994 to November 31, 1997, and also included a handwritten provision that Ms. Tipton "has agreed to forward contract to 1995," apparently because Ms. Quinn had not bred this mare in 1994 as originally contemplated. The original agreement acknowledged that Roxy was to bear a 1995 foal by a named stallion belonging to Ms. Tipton, also leased to Ms. Quinn for this purpose. The mare was to be rebred in 1995 to a stallion of Ms. Tipton's choice for a 1996 foal. Both the mare and the 1996 foal were to be provided care and maintenance by Ms. Quinn until the end of the contract. That arrangement was subject to a provision in the handwritten amendment that the mare must be confirmed by a vet as being in foal by May 1, 1995 or returned to Ms. Tipton.

The agreement also included an option to renew for two years and a provision stating that if the renewal option was not exercised in the time allotted then the mare was to be rebred to a stallion of Ms. Tipton's choice at Ms. Quinn's expense, resulting in return of the mare at the end of the contract with foal *in utero*. While this renewal option could arguably provide Ms. Tipton with a second foal, the contract was breached and the horses returned to Ms. Tipton prior to the time for the option to be exercised. Therefore, we interpret this agreement as entitling Ms. Tipton to one foal from this mare.

Ms. Tipton testified that the agreement provided for Ms. Quinn to get the first foal, Ms. Tipton the second, and for the mare to be returned with a foal *in utero*. As explained above, we find

-10-

no language in the agreement which would entitle Ms. Tipton to a second foal or to having the horse returned pregnant, since the horse was returned in August 1996 and the original agreement was not to expire until November 1997. Roxy's 1995 foal had been returned to Ms. Tipton's possession by court order. Ms. Tipton testified that if she were awarded this foal that would offset one of the two foals she claimed she was due. She also claimed $3500 damages as the value of the foal which was not conceived. Because we can find no basis in the agreement for her claim to a second foal, we conclude Ms. Tipton is not entitled to any damages for a 1997 foal.[11]

In addition, Ms. Tipton claimed $2658.48 in damages for daily board for Roxy from September 1996 through November 1997. Because Ms. Quinn was obligated to provide board for this mare and her foal through the end of the contract, we agree that Ms. Quinn was entitled to damages, but conclude that those damages must be assessed in accordance with the liquidated damages provision. Just as in Ansa's situation, the amount due under that provision is calculated to be $2500.

The agreement covering the mare Khemoshen stated its term at 2-1/2 years, beginning June 1, 1994 and ending November 31, 1996. The agreement states the lessee's purpose is for "the 1995 foal, by a stallion of Leasee's [sic] choice..." It includes a handwritten note that Ms. Quinn had reported that this mare had been bred for a May 1995 foal. The agreement further provided that the compensation to Ms. Tipton was care and maintenance of the mare and of any "get or increase." The mare was to be rebred in 1995 to a stallion of Ms. Tipton's choice, and Ms. Quinn was to maintain the 1996 foal until weaning. We interpret this agreement as giving Ms. Quinn the first (1995) foal, and Ms. Tipton the second (1996) foal. Khemoshen gave birth to two foals while in Ms. Quinn's care, and both foals were returned to Ms. Tipton's possession.

Ms. Tipton testified that she was due two foals under the contract, explaining that Ms. Quinn was to get the first (1995) foal, Ms. Tipton the second, and that the mare was to be returned to her in November of 1996 "in an impregnated state." When she regained possession of the horse in August 1996, apparently the mare was not pregnant. Consequently, she claimed she was due the two foals then in her possession. On review, the only contract provision requiring that the mare be rebred before her return to Ms. Tipton in November of 1996 was effective only if the renewal option was not timely exercised. The two-year option was to be renewed by August 30, 1996, and only if neither party was in default at that time. Since Ms. Tipton had sued for breach of contract, and had obtained possession of the horses because of Ms. Quinn's default in performance prior to the renewal option date, we conclude that the option provision was ineffective. Thus, we conclude that Ms. Tipton was due only one foal from Khemoshen.[12]

---

[11] We also note that because the mare was returned before any obligation to breed the mare arose, Ms. Tipton did not attempt to mitigate her damages by breeding the mare upon its return to her possession.

[12] Again, we note that Ms. Tipton could have rebred this mare after its return to her possession, since it would have been bred after August 30 under the agreement's option provision. She had a duty to mitigate her damages.

Ms. Tipton also claimed damages of $627 for daily board of the mare and foal for October and November of 1996 and for halter breaking the foal. These damages are the sort contemplated by the liquidated damages provision. Therefore, we conclude that Ms. Tipton was entitled to liquidated damages for the three months remaining on the agreement after the return of the horses, which is $500.

The liquidated damages provision, by its own terms, became effective if the horse was returned to Ms. Tipton during the term of the agreement. Our review of the agreements indicates that two of the agreements had expired before the horses were returned.

The agreement covering Lancers Shamia stated its term to be 1-1/2 years, beginning August 31, 1994, and ending April 30, 1996. A third party, Ms. Fields, was to get this mare's 1995 foal by a named stallion belonging to Ms. Tipton, and the contract reflects that the foal was due July 23, 1995. There is testimony that a foal of Lancers Shamia died in June or July of 1995, and we assume this is the foal whose birth was anticipated in the agreement.[13] Ms. Quinn was to provide care and maintenance of this mare until April 30, 1996 and all three parties agreed that the horse would be kept on Ms. Quinn's property. We conclude this agreement provides that neither Ms. Quinn nor Ms. Tipton was to receive any foal or foals.

In her testimony at trial, Ms. Tipton did not disagree with this interpretation. She testified several times that she was not due a foal from this horse. In spite of this testimony, she entered into evidence a document entitled summary of damages related to this horse which included an item, for which she claimed no damages, stating "Value of 1996 Foal (offset by 1995 foal)." When later asked about the implication in this statement that she had gained possession of this mare's 1995 foal, Ms. Tipton again testified that she was not due a foal under the terms of the agreement and that she did not have possession of any foal from this mare.

However, she claimed that Ms. Quinn's delay in returning the mare in April 1996 prevented Ms. Tipton from breeding the mare that year and, therefore, deprived her of a foal. She testified that she had written the contract "so that the mare would come back in the spring in time for me to breed her" and that Ms. Quinn had refused to return the mare at the expiration of the agreement and had hindered Ms. Tipton's attempts to retrieve the mare. She estimated the value of the foal she had anticipated at $5000. Ms. Tipton did not request damages for any boarding, since the mare had been kept beyond the term agreed upon.

On cross-examination, Ms. Tipton agreed that nothing prohibited her from breeding the returned mare in the fall. She stated that she preferred spring breeding, but some other horse owners bred in the fall. When asked if she could have bred the returned mare and not suffer any loss as a result of the mare being returned four months late, but chose otherwise, Ms. Tipton answered yes. She maintained she had a right to choose when to breed her mare. In essence, this is an admission that she could have mitigated or avoided the loss of a foal, but chose not to. Because a party seeking

---

[13]Ms. Tipton cited Ms. Quinn's failure to notify her of the foal's death as a breach of the agreement.

damages for breach of contract is under a duty to mitigate damages, we conclude that Ms. Tipton is not entitled to the $5000 she claimed for the delay in return of the mare Lancers Shamia. *ACG, Inc. v. Southeast Elevator, Inc.*, 912 S.W.2d 163, 169 (Tenn. Ct. App. 1995) and *Nashland Assocs. v. Shumate*, 730 S.W.2d 332, 333-34 (Tenn. Ct. App. 1987).

The agreement covering Touch of Class began June 5, 1994, and stated it had a 1-1/2 year term and was to end October 31, 1995. By handwritten notes dated December 23, 1994, it was acknowledged that Ms. Quinn had not bred this mare to Ms. Tipton's stallion originally named in the agreement, but had bred it to another stallion owned by a third person. The foal from that breeding was due in June 1995. Under the agreement, Ms. Quinn was to provide care and maintenance for Touch of Class and her 1994 foal "DDT Sassi Classi" and to rebreed Touch of Class to a stallion of Ms. Tipton's choice in 1995 (to produce a 1996 foal). The contract does not indicate that Ms. Tipton was to get the foal, but since the contract was to end in October 1995, we assume Touch of Class was to be returned while she was in foal. This contract did not contain an option to renew nor mention any potential second foal due to Ms. Tipton. For reasons that are not clear in the record, Ms. Quinn kept possession of Touch of Class beyond the expiration of the agreement.

Ms. Tipton testified that the agreement provided for Ms. Quinn to get the first foal from this mare, Ms. Tipton to get the second, and for the mare to be returned to her with a foal *in utero.* Based upon the provisions outlined above, acknowledging that a foal was due in June 1995 and establishing expiration of the agreement in October 1995, we must conclude that Ms. Tipton was mistaken regarding the obligations of the agreement.[14] We conclude that Ms. Tipton was entitled to have this mare returned to her in October 1995 with a foal *in utero.* In fact, Ms. Quinn retained the horse beyond October 1995, and the horse had a foal in 1996. Ms. Tipton obtained possession of two foals from this mare. In her direct examination on damages, Ms. Tipton claimed she had obtained possession of one foal and was entitled to two foals and, therefore requested $5000 as the value of a second foal. Because Ms. Tipton was due, at most, one foal, she is obviously not entitled to the $5000 claimed.

Ms. Tipton also claimed expenses for board of a foal returned to her in January of 1995 which, under the terms of the agreement, she claimed should not have been returned to her until October of 1995. She claimed $1591.51 in boarding costs for nine months. The agreement obligated Ms. Quinn to board Touch of Class's 1994 foal, "DDT Sassi Classi", which was given into Ms. Quinn's possession with its mother, until the end of the contract. However, a later notation on the contract, dated January 25, 1995, indicates this foal was returned to Ms. Tipton and another foal, "WF Pleasant Dream" was picked up on March 15, 1995"(on contract to be breed [sic])" to be "halter broke by Leasee [sic] for balance of this contract."

Although the language is far from clear, it appears Ms. Quinn was to maintain this second foal for the duration of the contract, until October 1995. There is no testimony in the record regarding the circumstances under which Sassi Classi was returned early. Similarly, there is no

---

[14]Testimony established that the gestation period for horses is eleven months.

testimony regarding the parties' intent that Pleasant Dream be maintained under this agreement. Therefore, we must interpret the handwritten addition, made before execution of the agreement, according to its terms. The agreement itself was not signed by the parties until after the notation that Sassi Classi had been returned to Ms. Quinn. Therefore, we conclude that Ms. Quinn was under no obligation under the terms of the agreement as executed to board Sassi Classi, and Ms. Tipton was not entitled to any damages for boarding the foal returned in January. Whether Ms. Quinn was obligated to board Pleasant Dream under this agreement is moot because she kept that foal until the horses were returned in August 1996. Ms. Quinn did agree, however, to halter break the foal Pleasant Dream. There is no testimony whether she did or did not.

While Ms. Tipton sought $200 damages for halter breaking a foal, she testified that this cost was incurred for halter breaking Touch of Class's 1996 foal. "The '96 foal that came back had to be broken, and I contracted someone to do that, for the sum of $200." We can find no basis in the agreement for any obligation on Ms. Quinn's part to halter break a 1996 foal. The agreement envisioned that the mare would have been returned to Ms. Tipton by October of 1995; thus, Ms. Tipton would have been responsible for making whatever arrangements she wished regarding breaking any foal born after that date. In other words, her payment for these services did not result from any breach of a contract by Ms. Quinn. Thus, we conclude that Ms. Tipton is not entitled to the $200 she claims for halter breaking the 1996 foal.

Based on the five exhibits marked summary of damages, Ms. Tipton's total claim for damages regarding the five conditional lease agreements relating to the mares was $23,932.70. The trial court awarded her $28,932.70 in damages for breaches of these agreements and the stallion servicing agreements. Having closely examined the testimony, the exhibits, and the trial court's ruling, we conclude that the trial court awarded Ms. Tipton $5,000 for breach of a stallion services contract for El Paso Seville.[15] Ms. Tipton testified that she was to receive breedings to four of her mares under that agreement, but only three of her mares were serviced. Ms. Quinn was keeping this stallion on her property and also had possession of the mare who was to be bred, that same Pleasant Dream which was mentioned in the lease agreement covering Touch of Class. Ms. Quinn valued the foal which would have resulted from that breeding at $5000.

In her brief, Ms. Quinn specifically states that the contracts regarding stallions are not the subject of this appeal. In the context of damages, we interpret that to mean that Ms. Quinn does not contest on appeal the $5000 award for breach of the stallion services contract for El Paso Seville.

Our recalculation of Ms. Tipton's damages under the liquidated damages and other provisions of the agreements, as individually set out above, results in an award to Ms. Tipton of $5500 for breaches of the five conditional lease agreements on the five mares. Therefore, we amend the award of damages to Ms. Tipton from $28,932.70 to $10,500.

---

[15]The trial court found that Ms. Quinn had breached the agreements regarding the stallions as well as those covering the mares. In its memorandum, the court specifically declined to award Ms. Tipton any damages regarding another stallion services contract because she had the stallion in her possession and did not mitigate her damages.

However, there is still the consideration of title to the foals born to Ms. Tipton's five mares. We have attempted to reconcile the testimony, pleadings and other documents in this case in trying to identify the six foals returned to Ms. Tipton's possession. The parties and the trial court appear to agree that six foals were born to Ms. Tipton's five mares while they were in Ms. Quinn's possession. The amended order granting partial summary judgment ordered prompt return of the five named mares "together with all six of the foals born to any of the above described mares while in the possession of the Defendant." Ms. Tipton's testimony on direct examination, as well as the five exhibits she introduced outlining her damages, account for only five of those: Khemoshen's 1995 and 1996 foals; Rozyczna's 1995 foal; Ansa's 1995 foal and Touch of Class's 1995 foal. Absent from this list is a 1996 foal from Touch of Class.

In an affidavit for her motion for partial summary judgment dated May 17, 1996, Ms. Tipton stated that Touch of Class was due to have a 1996 foal on May 26, and that the agreement entitled her to that foal. In an affidavit signed June 17, 1996, Ms. Quinn stated that Touch of Class had foaled and was nursing. She agreed that this foal was to be returned with the mare. When the trial court ordered possession of all six foals returned to Ms. Tipton, it also specifically ordered that title and ownership of Touch of Class's 1996 foal vest in Ms. Tipton. However, at trial Ms. Tipton originally testified to receiving possession of only one foal from Touch of Class, her 1995 foal. Ms. Tipton stated that if she were given this foal, it would offset the 1996 foal due her, clearly implying she did not have possession or ownership of this foal. At one point she introduced a picture of Touch of Class's 1995 foal which she said was returned to her under court order. Regarding the Touch of Class agreement, the following testimony was had:

> Q: Under the contract it's the same as the other; Ms. Quinn got the first one, and you got the second one, and it would come back with a foal[16] in utero; is that correct?
>
> A: Yes.
>
> Q: And the Court placed you back in possession with one of the foals; is that correct?
>
> A: Yes.
>
> Q: Now, to keep that horse, that takes care of one of those; is that correct?
>
> A: Right.
>
> Q: So you're supposed to get two, but you only have one right now; is that correct?

---

[16]The court reporter who prepared the transcript used the word "foe" for the word "foal" throughout the transcript. To reduce confusion, we will refer to foals when quoting from the record.

A: Yes, sir.

Having already testified that she had gotten the 1995 foal back by court order, and only had one Touch of Class foal in her possession, Ms. Tipton then testified that Touch of Class's 1996 foal "that came back" had to be halter broken and claimed damages for that.

Obviously, there is some error in Ms. Tipton's direct testimony. The inconsistency was clarified somewhat on cross-examination, when Ms. Tipton was asked about her exhibit, a summary of damages for the agreement on Touch of Class.

Q: What exactly are you referring to there, ma'am? Was there a '95 foal born?

A: Yes, there was.

Q: Was a '96 foal born?

A: Yes, there was.

Q: You've got both of those?

A: Yes.

We deduce that Ms. Tipton had possession of Touch of Class's 1996 foal. Ms. Tipton was given possession of six foals by court order in August 1996 and given ownership of the 1996 foals of Khemoshen and Touch of Class. Ms. Quinn had not disputed Ms. Tipton's claim to those two foals, acknowledging in her affidavit that those foals were to be returned with their mothers. We affirm the award to Ms. Tipton of the 1996 foals of Touch of Class and Khemoshen. The parties do not dispute, and the contract supports Ms. Tipton's entitlement to those two foals.

We can find no similar basis, however, for awarding the 1995 foals of those two mares to Ms. Tipton. Again, the parties agree that Ms. Quinn was to get ownership of those two foals, and Ms. Tipton's claim to them rests on her interpretation of the lease agreements for those two mares. As discussed above, we have concluded that her interpretation is incorrect. Therefore, Ms. Quinn is awarded ownership of the 1995 foals of Touch of Class and Khemoshen.

We affirm the award of the remaining two foals, one from Roxy and one from Ansa, to Ms. Tipton. As outlined above, Ms. Tipton was due one foal from each of those mares under the agreements. Since only one foal was born to each of those mares during their possession by Ms. Quinn, Ms. Tipton is entitled to those foals because of Ms. Quinn's breach of the agreements.

Based on our review of the terms of each agreement, as set out above, we conclude that Ms. Tipton was entitled to four foals: the 1996 Touch of Class foal, the foal from Roxy, the foal

-16-

from Ansa, and the 1996 foal from Khemoshen. Accordingly, we affirm the trial court's award of those foals to Ms. Tipton. However, we modify the trial court's award of the foals to award to Ms. Quinn the 1995 foals of Touch of Class and Khemoshen. Those two foals shall be returned to Ms. Quinn within thirty days of entry of this opinion and the judgment herein. The trial court shall consider any issues regarding compliance with this order and may devise an appropriate remedy, consistent with this opinion, if it finds that return of the two horses is impossible. Ms. Tipton is not entitled to boarding or other costs associated with her possession of Ms. Quinn's foals since August of 1996.

### III. Attorney's Fees

Each of the five conditional lease agreements included the following provision:

> Should any legal dispute arise between the parties herein LEASOR(S) [sic] will be entitled to all reasonable Attorney's fees, Filing fees, Court cost [sic], ETC. [sic] in their pursuit of a legal and just settlement in all matters as pertained to herein.

Pursuant to that provision, Ms. Tipton requested attorney's fees and, in support of that request, introduced an exhibit she described as billings from her previous attorney. Ms. Tipton testified that not all the billings were for this case, but also included services related to other matters. She testified that she had separated out the billings for her dispute with Ms. Quinn and that the total was $9,454.50. The last invoice from this attorney in the record is dated February 12, 1997. Also entered into evidence was her trial counsel's affidavit and bill showing 61.7 hours worked. The trial court awarded Ms. Tipton $18,739.50 for fees she paid her attorneys in pursuing this matter.

On appeal, Ms. Quinn maintains that the trial court erred in calculating the amount of fees because the total includes fees attributable to Ms. Tipton's first counsel who agreed to waive all fees when he withdrew from representation of Ms. Tipton. This argument rests on a letter from Ms. Quinn to her prior attorney dated June 2, 1997. That letter appears in the record as an attachment to a pro se motion filed by Ms. Tipton asking for time to hire counsel. Ms. Quinn relies on a sentence wherein Ms. Tipton agrees "to accept your offer to resign as my attorney in any and all legal concerns with your waiver of all fees." Ms. Quinn argues that this letter "appears to be an agreement" between Ms. Tipton and the prior counsel to waive all fees.[17]

Remarkably, this letter was never introduced into evidence, and Ms. Tipton was not questioned about it. At trial, the issue of what she meant in this letter was simply not raised. In addition, Ms. Tipton was not cross-examined about her testimony that she paid $9,454.50 in fees

---

[17] In her brief, Ms. Tipton argues this "waiver" did not apply to fees already paid and that the attorney fees awarded for her first counsel's efforts reimbursed her for amounts she already had paid him before the waiver.

to her former attorney for services related to this lawsuit. Thus, her testimony remains unrebutted on that issue.

We cannot consider the letter and any questions it raises for two reasons: (1) it was not introduced into evidence, and (2) the trial court was not asked to consider the letter and was not provided any evidence upon which it could determine the issues Ms. Quinn now seeks to raise on appeal.

Ms. Quinn also asserts that the fees assessed by Ms. Tipton's second counsel duplicate, in part, the first attorney's efforts. With regard to trial counsel's bill, Ms. Quinn's only argument is that that attorney duplicated efforts of the prior attorney beyond a reasonable amount necessary. However, our review of the record indicates no such challenge was made in the trial court. This court will not consider issues raised for the first time on appeal. *Davis v. Tennessee Dept. of Employment Security*, 23 S.W.3d 304, 310 (Tenn. Ct. App. 1999).

Therefore, we affirm the trial court's award of attorney's fees.

## IV. Discovery Sanctions

Ms. Quinn argues that the trial court abused its discretion in assessing $750 in discovery sanctions against her by failing to make a factual finding of actual prejudice or provide her with notice that she could be sanctioned for failing to timely respond to discovery requests. She also maintains that Ms. Tipton incurred no attorney's fees because she was acting *pro se* when she filed the motion for discovery sanctions.

The record shows that Ms. Tipton was not acting *pro se* when the motions to compel and for sanctions were filed. In fact, on November 7, 1997, Ms. Tipton's second counsel filed the motion to compel, asserting that Ms. Quinn had failed to timely respond to interrogatories. On December 1, 1997, the trial court granted the motion, ordering Ms. Quinn to respond to the discovery requests within fifteen days "or suffer such sanctions as may be imposed pursuant to Rule 37.02 of the Tennessee Rules of Civil Procedure." On February 6, 1998, after a hearing, the trial court issued a second order compelling Defendant to respond "fully, completely and in a non-evasive manner" to discovery, finding that Ms. Quinn failed to comply with the December 1 order. The court also ordered Ms. Quinn to pay $750 in sanctions for the "reasonable and necessary attorneys' fees for the preparation and argument of the Motion for Sanctions against the Defendant."

Rule 32.02 of the Tennessee Rules of Civil Procedure authorizes a variety of sanctions against persons who fail to obey orders to provide or permit discovery. The Rule provides that in lieu of or in addition to those sanctions:

> the court shall require the party failing to obey the order or the attorney advising the party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was

substantially justified or that other circumstances make an award of expenses unjust.

Tenn. R. Civ. P. 32.02(E).  Absent an affirmative showing of abuse of discretion, a trial court's decision to impose sanctions will not be disturbed.  *See State ex rel. Comm'r, Dep't of Transp. v. Cox*, 840 S.W.2d 357, 367 (Tenn. Ct. App. 1991).

We find no abuse of discretion here.  Under these circumstances, where Ms. Quinn failed to timely comply with the trial court's December order, Rule 37.02(E) clearly authorized the sanction.  Further, the December 1, 1997 Order clearly put the Defendant on notice that sanctions were possible for failure to comply.

## V.  Conclusion

The judgment of the trial court finding that the defendant had breached her agreements with the plaintiff is hereby affirmed.  The trial court's awards of attorneys' fees and discovery sanctions are also affirmed.  The award of damages for breach is modified from $28,932.70 to $10,500 and the award of the foals is modified such that Ms. Tipton is awarded four foals and Ms. Quinn is awarded two foals, as set out specifically herein.  The case is remanded for such further proceedings as may be necessary, consistent with this opinion.  The costs of this appeal are to be divided equally between the parties for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE