**ROCK IVY HOLDING, LLC**

**v.**

**RC PROPERTIES, LLC et al.**

Court of Appeals of Tennessee, at Nashville.

Nov. 18, 2013 Session.

Jan. 30, 2014.

Application for Permission to Appeal Denied by Supreme Court June 20, 2014.

John S. Hicks and Elizabeth B. McCostlin, Nashville, Tennessee, for the appellant, Rock Ivy Holding, LLC.

Eugene N. Bulso, Jr., Roger G. Jones, and Paul Joseph Krog, Nashville, Tennessee, for the appellants, H. Preston Ingram and FUM, LLC.

Charles E. Morton, IV, Franklin, Tennessee, for the third party defendant/appellant, Huntly S. Gordon.

John O. Belcher and Curtis R. Harrington, Nashville, Tennessee, for the appellees, Linked, LLC and Stephen T. Church.

Phillip B. Jones, Nashville, Tennessee, for the appellees, Scott Sohr and RC Properties, LLC.

## OPINION

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

This multi-faceted business dispute, which arises in principal part from the real estate collapse of 2008, involves five limited liability companies, eight individuals who are either members or officers of the respective companies, 530 acres of undeveloped real estate, and $7 million of secured notes that were personally guaranteed by six of the individuals. Over the course of two years, SunTrust Bank, the

holder of the notes, agreed to extensions of the original maturity date; a final extension was granted until August 7, 2008. A call for capital contributions was approved but it produced insufficient funds to pay off the debt. Thereafter, two of the individuals, one of whom was the president of Rock Creek, and both of whom personally guaranteed a portion of the debt, formed another entity which then acquired the notes from the bank. Rock Creek Development, LLC ("Rock Creek"), which owned the real estate, then agreed to sell a substantial portion of its property to pay off the balance owing on the notes. In an attempt to stop the sale, Rock Ivy Holding, LLC ("Rock Ivy"), one of three members of Rock Creek, filed this derivative action for itself and on behalf of Rock Creek against Rock Creek's members: RC Properties, LLC; Linked, LLC; two officers of Rock Creek; and several individuals who were members of the defendant companies. The complaint alleged, *inter alia*, various conflicts of interests by the individual defendants and various breaches of statutory and contractual duties by members and/or officers. Pursuant to an agreed order, the sale proceeded, the net proceeds were held in the registry of the court, and the remaining claims went to trial. After eights days of a bench trial, the defendants moved to dismiss the complaint pursuant to Tenn. R. Civ. P. 41.02 at the close of the plaintiff's case-in-chief. The trial court granted the motion and dismissed all of the plaintiff's claims. Thereafter, several defendants filed various motions to recover their respective attorneys' fees and expenses. Some of the motions were based on Tenn.Code Ann. § 48-249-804, which pertains to derivative actions, and others were based on indemnification provisions in Rock Creek's Operating Agreement. The trial court granted some of the fee requests and denied others. In this appeal, Rock Ivy challenges

the dismissal of its claims and the assessment of attorneys' fees. Two individual defendants appeal the denial of their claims for attorneys' fees. The holder of the notes appeals the denial of its claim for "default interest" and penalties. We affirm the trial court in all respects except for the trial court denying the claim for default interest on the notes. We have concluded that the holder of the notes is entitled to recover default interest from the time the notes were declared to be in default. Accordingly, this issue is remanded for further proceedings.

The business entity at the center of this action is Rock Creek Development, LLC ("Rock Creek"). It has three members, each of which is a limited liability company: RC Properties, LLC ("RC Properties"); Rock Ivy Holding, LLC ("Rock Ivy"); and Linked, LLC ("Linked"). As stated in Rock Creek's Operating Agreement dated May 1, 2006, RC Properties had 50% governance rights and 25% financial rights; Rock Ivy had 25% governance rights and 55% financial rights; and Linked had 25% governance rights and 20% financial rights.

The stated purpose of forming Rock Creek was to acquire, own, and develop real property. Soon after its creation, Rock Creek acquired real estate consisting of approximately 530 acres on the east side of Interstate 65 ("East Side Tract"), and 154 acres on the west side of Interstate 65 ("West Side Tract") in the counties of Maury and Williamson. Rock Creek also secured two loans from SunTrust Bank ("SunTrust") totaling over $7 million. The first loan, in the amount of $6,864,000, was issued on September 21, 2006, for the purpose of paying the indebtedness incurred by members for the original real estate purchase. The second, issued on March 2, 2007, in the amount of $487,500, was for the purpose of acquiring additional proper-

ty. Both loans, which were originally scheduled to mature on September 21, 2007, were secured by a Deed of Trust on the real estate property and were personally guaranteed by some individuals, specifically Scott Sohr and Preston Ingram, who were individual members of RC Properties; Jeff Ennis and Steve Church, individual members of Linked; and Vicki Gordon and Tom Parkinson, who were two of the four members of Rock Ivy.

Over the course of two years, the original maturity date passed and SunTrust agreed to several extensions of the original maturity date. SunTrust initially agreed to extend the payoff date until December 21, 2007; the date was further extended until June 21, 2008, and then a final extension was granted until August 7, 2008.

Due to the impending payoff date, as well as the onset of the national recession and the dramatic decline in the real estate market during that time, Sohr, acting in his capacity as President of Rock Creek, sent notice to RC Properties, Rock Ivy and Linked on July 25, 2008, of a capital call stating that Rock Creek required additional capital contributions in order to meet its financial obligations to SunTrust. The notice further stated that if approved, the three members would need to make capital contributions on August 5, 2008, in accordance with the percentage of their financial rights in Rock Creek. On July 29, four days after Sohr notified Rock Creek's members of the capital call, SunTrust sent a letter to Rock Creek, demanding payment of its full outstanding debt by August 7, 2008.

At the capital call meeting on August 5, RC Properties and Linked (which together possessed 75% of the governance rights) voted to confirm the capital call; as a consequence, the capital call passed. Accordingly, Rock Ivy was to provide its 55% financial share, which amounted to $4,035,000, RC Properties was to remit its 25% share, which amounted to $1,834,031, and Linked was to remit its 20% share, which amounted to $1,467,225. RC Properties and Linked each promptly remitted their share of the required capital call, while Rock Ivy made no contribution. The contributions by RC Properties and Linked were promptly remitted to SunTrust to reduce the debt on the two notes, and, as a result, SunTrust granted Rock Creek until October 15, 2008, to pay the outstanding debt. Following this payment, the balance owed on the notes was approximately $4,035,000, Rock Ivy's share of the capital call.

Despite this extension, Rock Ivy made no capital contribution. As a result, Sohr and Ingram proposed to Rock Ivy and Linked that the members of Rock Creek collectively purchase the notes from SunTrust; both Rock Ivy and Linked declined. Thereafter, Sohr and Ingram formed another limited liability company, FUM, LLC ("FUM"), which then purchased the notes from SunTrust in December 2008. As a consequence, FUM succeeded to the rights of SunTrust and became the lawful holder of the notes owed by Rock Creek.

On January 7, 2009, FUM's counsel sent Rock Creek a Notice of Assignment and Default officially informing Rock Creek and its members that FUM had purchased the notes and that if Rock Creek did not pay its obligation in full on or before January 20, 2009, it would constitute an Event of Default. The foregoing notwithstanding, no efforts were made to satisfy the obligations owing to FUM on the notes.

In the interim, Vanguard Properties of the Carolinas, LLC ("Vanguard"), expressed an interest in purchasing the East Side Tract of the Rock Creek property. Sohr, as President of Rock Creek, began negotiating the sale of the real estate, and, these negotiations resulted in an offer of

$11,673.63 per acre, or approximately $5,925,000, with the additional requirements that Rock Creek shall reinvest over $1,000,000 in the entity formed by Vanguard to acquire the property, and that Vanguard be able to receive any awards given for eminent domain. The offer also provided that Vanguard could purchase the Harrison and Johnson Farm ("the Harrison Farm"), which was adjacent to Rock Creek's property and owned by another partnership of Ingram and Sohr.

As these negotiations were ongoing, the Tennessee Valley Authority ("the TVA") made an offer to Rock Creek to purchase 20 acres of the East Side Tract for approximately $28,500 per acre, a noticeably higher amount than Vanguard's offer.

On May 26, 2009, when the offers from Vanguard and TVA were presented to the members of Rock Creek for a decision, RC Properties and Linked voted to approve the sale of the East Side Tract and consented to the side agreement involving the Harrison Farm, while Rock Ivy vigorously objected. Because RC Properties and Linked controlled 75% of the governance rights, Rock Creek accepted the offer from Vanguard and signed the contract of sale. Shortly thereafter, on August 28, 2009, and before the closing of the transaction, Rock Ivy filed this derivative action on behalf of Rock Creek and for itself to enjoin the sale. Seven defendants were named: Rock Creek's other two members, RC Properties and Linked; Vanguard, the proposed purchaser of Rock Creek's real estate; FUM, the owner of the notes; and three individuals, Sohr, Ingram, and Church.

Immediately upon learning of the filing of the action by Rock Ivy, Vanguard retracted the reinvestment provision that would have allowed Rock Creek to invest in the purchasing entity to be created by Vanguard; it also demanded that the TVA's offer, and any proceeds to be derived therefrom, be reserved for Vanguard. Over the next few days, all parties, even Rock Ivy, asked the court to allow the sale to proceed provided the net proceeds were held by the court pending the resolution of other issues. After hearing from all parties, the trial court entered an order on September 15, 2009, that confirmed the agreement to permit the sale of the property to proceed, to allow the closing agent to pay all closing costs, including the notes that were secured by the deed of trust, and to pay the net proceeds from the sale into court. At closing, FUM was paid in full on the principal balances owing, along with non-default interest, while the remaining proceeds, totaling 1.9 million dollars, were paid into the registry of the court. Additionally, Vanguard was dismissed from the suit.

Thereafter, RC Properties, Ingram, and Sohr filed an Answer and Counter-Claims by which they sought, inter alia, to recover their respective attorneys' fees and expenses pursuant to Tenn.Code Ann. § 48-249-804 and the indemnification provision of the Operating Agreement. For its part, FUM filed an Answer and a Third-Party Complaint against Rock Creek seeking to collect all amounts owed under the promissory notes, including unpaid principal, interest, charges, fees, costs, and expenses.

After the closing occurred, Rock Ivy filed an Amended Verified Complaint asserting several claims against the various defendants, including: breach of contract, breach of the statutory duty of loyalty, breach of the statutory duty of care, and breach of the statutory duty of good faith and fair dealing against RC Properties and Linked. Rock Ivy also asserted claims of breach of the statutory duty of care against Sohr and Church as officers of Rock Creek; violation of Tenn.Code Ann. § 48-249-404 against RC Properties, Sohr,

and Ingram; civil conspiracy against Sohr, Church, Ingram, RC Properties, Linked, and FUM; and appointment of receiver and judicial dissolution of Rock Creek.

The various defendants filed their respective Answers. RC Properties, Sohr, and Ingram filed an Answer to the Amended Complaint and renewed their Counter–Claim for expenses and attorneys' fees; RC Properties renewed its previous Counter–Claim asserting claims of conversion against Rock Ivy. FUM filed its Answer, and, the following day, Linked and Church filed an Answer and Counter–Claim, requesting expenses and attorneys' fees pursuant to the indemnification provision of the Operating Agreement as well as Tenn. Code Ann. § 48–249–804. Subsequently, RC Properties filed a Third–Party Complaint against Huntly Gordon, an individual member of Rock Ivy, asserting against him personally the same conversion claims it had asserted in its Counter–Claim against Rock Ivy.

A bench trial was held over eight days in February and April of 2012. At the conclusion of Rock Ivy's case-in-chief, the defendants collectively made an oral motion pursuant to Tenn. R. Civ. P. 41.02 to dismiss all claims in the Amended Complaint. The trial court granted the motion to dismiss from the bench. Because the plaintiff's case-in-chief was tried over eight days and none of the defendants' Counter–Claims or Third–Party Claims had yet been presented, it was agreed that the trial would recess without prejudice regarding the conversion claims asserted by RC Properties against Rock Ivy and Huntly Gordon, as well as FUM's Third–Party Complaint against Rock Creek to recover

"default interest" and attorneys' fees under the promissory notes.

On April 18, 2012, the trial court announced its findings of fact and conclusions of law; an Order adopting these findings was entered on May 8, 2012. The order dismissed all of Rock Ivy's claims as to all defendants; additionally, the court ruled that Linked was entitled to recover from Rock Ivy its attorneys' fees pursuant to Tenn. Code Ann. § 48–249–804, and instructed Linked to submit a fee application. As to the other defendants, the trial court declined to award attorneys' fees to RC Properties or any of the individuals at that time.

As instructed, Linked filed a motion to set the amount of fees it had been awarded. In the same application, Church sought to recover his attorneys' fees pursuant to Tenn. Code Ann. § 48–249–804 or the indemnification provision of the Operating Agreement.

The other parties also filed motions relating to the issue of attorneys' fees and the reserved claims. Sohr filed a motion to recover his attorney's fees and expenses pursuant to both Tenn. Code Ann. § 48–249–804 [1] and the indemnification provision in Rock Creek's Operating Agreement. Ingram filed a motion to revise the May 8, 2012 Order, in which he sought to recover his attorneys' fees pursuant to Tenn. Code Ann. § 48–249–804.

The trial court awarded Sohr a judgment against Rock Ivy for attorney's fees and expenses in the amount of $104,028.39 pursuant to the Operating Agreement's indemnification provision and Tenn. Code Ann. § 48–249–115(e), but denied Sohr's

---

1. That statute reads, in pertinent part:
 (a) DEFENDANT'S EXPENSES. On termination of the proceeding, the court may require the plaintiff to pay any defendant's reasonable expenses, including attorneys'

 fees, incurred in defending the proceeding, if it finds that the proceeding was commenced without reasonable cause.
 Tenn. Code Ann. § 48–249–804(a) (2012).

request for fees under the derivative action statute, specifically Tenn.Code Ann. § 48–249–804.

As for Ingram, the trial court denied Ingram's request for attorneys' fees and expenses pursuant to the derivative action statute, Tenn.Code Ann. § 48–249–804.

The trial court awarded Linked a judgment against Rock Ivy pursuant to Tenn. Code Ann. § 48–249–804 for attorneys' fees and expenses in the amount of $193,285.69. As for Church's claim, the trial court ruled that Church is entitled to recover from Rock Ivy his attorneys' fees and expenses pursuant to Tenn.Code Ann. § 48–249–804.

In response to a motion to enter a "final judgment," the trial court required the parties to file several motions and applications for fees to resolve all pending claims: one setting the amounts sought by FUM pursuant to its Third–Party Complaint, and others by Sohr and Ingram, each of whom were seeking attorneys' fees they claimed under the derivative statute, Tenn. Code Ann. § 48–249–804.[2]

After the requested motions and applications for fees were filed and considered, the trial court made a provisional award of attorneys' fees for Ingram and Sohr, respectively, each of which was contingent upon an appeal and the appellate court finding that Ingram and/or Sohr were entitled to recover attorneys' fees under the statute.[3] In addition, the trial court denied FUM's motion seeking default inter-

est still outstanding under the notes, expenses, and attorneys' fees.

Thereafter, on October 26, 2012, RC Properties entered a notice of voluntary nonsuit, dismissing its Counter–Claim and Third–Party Claim against Rock Ivy and Huntly Gordon, respectively, without prejudice, which the trial court affirmed.

The trial court subsequently entered an order directing the funds held in the court registry be distributed to Rock Creek upon entry of a Final Order, subject to the attorneys' fees and expenses awarded to Sohr and Church pursuant to the indemnification provision in the Operating Agreement.

Church then filed a motion seeking indemnification from Rock Creek for a share of the attorneys' fees incurred by Linked; the trial court granted Church's motion for attorneys' fees totaling $96,642.85 as indemnity from Rock Creek, but held that these fees are not recoverable against Rock Creek to the extent that Linked recovers the full amount of its award against Rock Ivy. The trial court designated this order as final.

Gordon filed a Post–Trial Request for Attorney's Fees and Expenses pursuant to Tenn.Code Ann. § 48–249–804 and the indemnification provision of the Operating Agreement; the court denied the motion because Gordon did not raise a Counter–Claim for attorney's fees in his Answer at the time the Third–Party Complaint was voluntarily dismissed.

---

**2.** To avoid confusion, it is important to recognize that the trial court found that Sohr was entitled to recover attorneys' fees pursuant to the indemnification provision of Rock Creek's *Operating Agreement*, but not under the derivative action statutory scheme.

**3.** The trial court's provisional award of attorneys' fees following the denial of such fees was done in the interest of judicial economy,

a practice that is favored in circumstances such as this. Sohr and Ingram contend on appeal they are entitled to recover these fees; however, Rock Ivy contends they are not. We have concluded that neither Sohr nor Ingram is entitled to attorneys' fees and expenses pursuant to Tenn.Code Ann. § 48–249–804, therefore this issue is moot.

## ANALYSIS

Rock Ivy, Ingram, FUM, and Gordon filed timely notices of appeal. Rock Ivy raises several issues relating to the dismissal of its several claims; it also contends the court erred in holding it liable for other parties' attorneys' fees. Ingram raises issues relating to the denial of his claim for attorneys' fees. FUM appeals the denial of its claim for default interest, expenses, and attorney's fees. Gordon appeals the denial of his claim for attorney's fees. We shall address each issue in turn.

## I. ROCK IVY'S CLAIMS

The trial court dismissed all of Rock Ivy's claims pursuant to Tenn. R. Civ. P. 41.02, finding that Rock Ivy failed to make out a prima facie case by a preponderance of the evidence. Rock Ivy asserts this was error. Specifically, it asserts the court erred in holding that the sale of Rock Creek's real estate to Vanguard was "fair." In furtherance of this argument, Rock Ivy contends the trial court incorrectly applied the "entire fairness" test which was applicable due to the conflict of interest created by Sohr and Ingram regarding the transaction. Additionally, Rock Ivy asserts the trial court erred in holding that Sohr and Church did not breach their fiduciary duties to Rock Creek and its members, and erred in declining to find that a civil conspiracy existed among RC Properties, Ingram and Sohr.[4]

----

**4.** Rock Ivy also raises two other issues related to attorneys' fees and expenses which we shall address in another section.

**5.** As the trial judge correctly noted in making its ruling from the bench, a Tenn. R. Civ. P. 41.02 motion for involuntary dismissal in a bench trial is to be distinguished from a Tenn. R. Civ. P. 50 motion for directed verdict in a jury trial. *See Burton,* 129 S.W.3d at 520. In that case, the court explained that "motions for directed verdicts have no place in bench

## A. INVOLUNTARY DISMISSAL—TENN. R. CIV. P. 41.02(2)

In an action tried by the court *without a jury,* after the plaintiff has completed the presentation of plaintiff's evidence, the defendant or defendants may move for dismissal "on the ground that upon the facts and the law the plaintiff has shown no right to relief." Tenn. R. Civ. P. 41.02(2) (2010). As trier of the facts, the trial judge may determine the facts and "render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusion of law and direct the entry of the appropriate judgment." *Id.*

A motion for involuntary dismissal pursuant to Rule 41.02(2) challenges the sufficiency of the plaintiff's proof. *Burton v. Warren Farmers Co-op.,* 129 S.W.3d 513, 520 (Tenn.Ct.App.2002) (citing *Smith v. Inman Realty Co.,* 846 S.W.2d 819, 821 (Tenn.Ct.App.1992)). A claim may be dismissed pursuant to a Rule 41.02(2) motion if, based on the law and the evidence, the plaintiff has failed to demonstrate a right to the relief it is seeking. *Id.* (citing *City of Columbia v. C.F.W. Constr. Co.,* 557 S.W.2d 734, 740 (Tenn.1977)). Motions under Rule 41.02(2) require less certainty than motions for directed verdict under Rule 50.[5] *Id.; Inman Realty Co.,* 846

----

trials, while Tenn. R. Civ. P. 41.02(2) motions have no place in jury trials." *Id.* A Rule 50 motion for directed verdict provides a vehicle for deciding questions of law. The question presented is whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide. *Id.* The courts do not weigh the evidence when they answer this question, nor do they evaluate the credibility of the witnesses. *Id.* Rather, they review the evidence in the light most favorable to the non-moving party, give the non-moving party

S.W.2d at 822. Thus, a court faced with a Rule 41.02(2) motion need only impartially weigh and evaluate the plaintiff's evidence just as it would after all the parties had concluded their cases and may dismiss the plaintiff's claims if the plaintiff has failed to make out a prima facie case by a preponderance of the evidence. *Id.* at 520–21; *Thompson v. Adcox,* 63 S.W.3d 783, 791 (Tenn.Ct.App.2001).

The standard by which the appellate court reviews a trial court's grant of a Rule 41.02 involuntary dismissal is governed by Tenn. R.App. P. 13(d). *Building Materials Corp. v. Britt,* 211 S.W.3d 706, 711 (Tenn.2007); *Burton,* 129 S.W.3d at 521. This is because the trial court has used the same reasoning to dispose of the motion that it would to make a final decision at the close of all the evidence. *Burton,* 129 S.W.3d at 521. Thus, we review the record on appeal de novo with a presumption that the trial court's factual findings are correct and we will affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or unless the trial court has committed an error of law affecting the outcome of the case. *Id.* We will also give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses. *Id.*

**B. CONFLICT OF INTEREST TRANSACTION**

Rock Ivy alleged that Sohr and Ingram violated Tenn.Code Ann. § 48–249–404 by voting and approving the sale of the East Side Tract for a price far below its market value and by including in the transaction the sale of the Harrison Farm owned by Sohr and Ingram. Rock Ivy also asserts that Sohr, as President of Rock Creek, co-owner of the Harrison Farm and a member of FUM (the entity that owned the notes), and Ingram, as a member of FUM and co-owner of the Harrison Farm, had conflicts of interest.

The statute Rock Ivy relies upon provides in pertinent part:

(a) Definition. A conflict of interest transaction is a transaction with the LLC in which a member, manager, director or officer, as applicable, of the LLC has a direct or indirect interest. A conflict of interest transaction is not void and is not voidable by the LLC, and does not violate the duty of loyalty in § 48–249–403(b)(2), solely because of the interest of a member, manager, director or officer in the transaction, if any one (1) of the following is true ... including that ... (3) *the transaction was fair to the LLC*[.]

Tenn.Code Ann. § 48–249–404 (2008) (emphasis added).

The trial court determined there was a conflict of interest transaction and a conflict of interest vote "in that by the time of the sale to [Vanguard], RC Properties and its members [Sohr and Ingram] had become a creditor of Rock Creek and was in [sic] adversarial position to Rock Creek." The trial court also found that the sale of the Harrison Farm "probably created some sort of conflict of interest." Therefore, the determinative issue was whether the transactions in which RC Properties, Sohr and Ingram had conflicts of interest were fair to Rock Creek.

■ As part of its legal analysis to determine the fairness of the transactions to Rock Creek, the trial court considered the relevant law of Delaware.[6] This was due

---

the benefit of all reasonable inferences, and disregard all the evidence contrary to the non-moving party's position. *Id.*

**6.** The Tennessee Revised Limited Liability Company Act draws heavily from the Uniform

in part to the fact Tennessee courts have not specifically addressed the analysis for determining whether a transaction is fair to an LLC, and the Tennessee Revised Limited Liability Company Act, which became effective January 1, 2006, made sweeping revisions to the law regarding the operations of limited liability companies. *See* Tenn.Code Ann. § 48–249–101 *et seq.* Moreover, in matters of corporate law, Tennessee courts look to Delaware law due in part because Delaware has become the most popular state in which to incorporate businesses, and, as a result, its judiciary have become specialists in the field. *McCarthy v. Middle Tenn. Elec. Membership Corp.*, 466 F.3d 399, 409–10 (6th Cir.2006) (citing *Bayberry Assocs. v. Jones*, No. 87–261–II, 1988 WL 137181, at *5 n. 8 (Tenn.Ct.App. Nov. 9, 1988), *vacated*, 783 S.W.2d 553, 560 (Tenn.1990)) (The appellate court decision in *Bayberry* was vacated, but the Tennessee Supreme Court did not dispute the lower court's use of Delaware law.).

■ In Delaware, when an officer or member of an LLC is alleged to have participated in a transaction in which he had a conflict of interest and it is alleged that the transaction was not fair to the LLC, the court analyzed the issues based on the "entire fairness" test. When this test applies, the burden of persuasion initially lies with the defendant. *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1179 (Del.Ch.1999), *aff'd*, 766 A.2d 437 (Del.2000).

■ There are two components to the "entire fairness" test: fair dealing and fair price. *Id.* at 1179–80 (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.1983)). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* at 1180 (quoting *Weinberger*, 457 A.2d at 711). Fair price "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* (quoting *Weinberger*, 457 A.2d at 711). In making a determination as to the entire fairness of a transaction, the court does not focus on one component over the other, but examines all aspects of the issue as a whole. *Id.* The "fair dealing" element of the entire fairness analysis "also embraces the duty of candor owed by corporate fiduciaries to disclose all material information relevant to corporate decisions from which they may derive a personal benefit." *Id.* (quoting *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989)).

Applying the above principles, the trial court found that although RC Properties, Sohr, and Ingram had conflicts of interest, the transaction was fair to Rock Creek. As the court explained, "Rock Creek needed to sell either the east side or the west side [and] [t]he west side was listed with a broker but ... didn't sell." The court also noted that the parties agreed that the West Side Tract was more ready to develop than the East Side Tract, but the West Side Tract never sold despite being listed with a broker. Ultimately, the court determined that Rock Creek needed to pay off its debt, and the sale to Vanguard was a reasonable solution in light of the declin-

Limited Liability Company Act as well as Delaware law. Eric Reagan, *Tennessee's New Limited Liability Company Act: New Ways of Doing Business*, 73 Tenn. L.Rev. 267, 280 (2006) (citing Limited Liability Company Act, Del.Code Ann. tit. 6, §§ 18–101 to –1109 (1999)).

ing real estate market and shortage of buyers.

On appeal, Rock Ivy argues that the trial court incorrectly applied the entire fairness test to the conflict of interest transaction. Specifically, it argues that the trial court failed to consider the fair dealing prong of the entire fairness test, failed to shift the burden of proving entire fairness to the defendants, and failed to consider that FUM was actively seeking elevated interest and fees from Rock Creek during the entirety of the transaction. We find that the trial court did consider the fair dealing prong because the chancellor specifically set forth both aspects of the test in her ruling from the bench. Thus, we will examine each aspect of the entire fairness doctrine de novo with a presumption that the trial court's findings of fact are correct.

### 1. *Fair Dealing*

As stated above, fair dealing includes factors such as "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Considering these factors, for the reasons set forth below, we find that the evidence does not preponderate against the trial court's findings that the sale to Vanguard was fair under the circumstances.

(a) Initiation and Timing of the Transaction

Rock Ivy contends it is apparent that the conflict of interest transaction involved unfair dealing with Rock Creek because Sohr and Ingram, through FUM, pres-

sured Rock Creek to complete the sale to Vanguard by placing Rock Creek in default on the notes. Rock Ivy insists this is inconsistent with inherent fairness, asserting that but for FUM placing the notes in default, Rock Creek could have held the East Side Tract and marketed the property for a longer period of time and obtained its appraisal value. Rock Ivy alleges that the primary motivating factor to force the sale was to get rid of the Harrison Farm that Sohr and Ingram jointly owned in order to further separate themselves from each other.[7] Sohr, the President of Rock Creek, allowed the sale of the East Side Tract to be made contingent upon the sale of the Harrison Farm, which, Rock Ivy alleges, detracted from the value of Rock Creek's property. As a consequence, Rock Ivy insists the trial court should have shifted the burden to FUM, Sohr, and Ingram to prove the need to sell.

Prior to FUM acquiring the notes, SunTrust had demanded full payment on the outstanding debt, the real estate market was in decline, and there were no offers to purchase either tract of land. Further, Rock Ivy never remitted its share of the capital call, while Rock Creek had as little as $2,000 in its bank account. Facing either foreclosure and/or suits on the personal guarantees, FUM purchased the notes from SunTrust and held them in abeyance for eight months by not filing suit on the personal guarantees or foreclosing on Rock Creek's property. During this period, Vanguard agreed to pay over $11,000 an acre for a portion of Rock Creek's property, and the ensuing sale produced sufficient cash to pay off the notes, satisfy all guarantees, and produce a cash surplus of 1.9 million dollars.

---

7. Sohr and Ingram owned several entities together, and, at the time of the sale, both individuals were in the process of dividing those entities. Thus, Rock Ivy contends that

RC Properties pressured the sale of the East Side Tract in order to get rid of the Harrison Farm in furtherance of Sohr and Ingram's separation.

The foregoing notwithstanding, Rock Ivy contends there were several alternatives to selling the land to Vanguard: accept either of Rock Ivy's offers to purchase a portion of the East Side Tract, hold an auction, have the other members contribute Rock Ivy's share of the capital call, obtain financing through another bank, or hold the property (assuming FUM would agree to defer payment even longer). However, none of these options would produce as positive a result as the sale to Vanguard.

On May 20, 2009, Rock Ivy offered to purchase approximately 200.93 acres of the East Side Tract for $2.05 million, of which the purchase price would be paid with a $750,000 cash payment by Rock Ivy to Rock Creek as well as a credit of $1.3 million in exchange for Rock Ivy's membership interest in the LLC. Then, on May 22, 2009, Rock Ivy offered to purchase the same property for $2.2 million, of which $900,000 in cash would be paid as part of the purchase price as well as a credit for $1.3 million in exchange for Rock Ivy's membership interest. However, each of these offers were at a price less than $11,000 per acre, and the cash proceeds would not have been sufficient to satisfy Rock Creek's obligations on the notes. Furthermore, neither RC Properties nor Linked were willing to accept Rock Ivy's credit or accept Rock Ivy as debtor.

Rock Ivy also asserts there was an option to auction the property; however, there were no assurances the price per acre would be better than offered by Vanguard, and an auction involved uncertainties and delays.

Also, Rock Ivy argues that RC Properties or Linked should have contributed to Rock Ivy's portion of the capital call; however, they had no obligation under the Operating Agreement to make additional contributions or to finance another member's obligations.

Furthermore, other financial lenders were not willing to take over the loan unless individual members signed additional personal guarantees. The individual members of RC Properties, Linked, as well as Rock Ivy, were unwilling to sign personal guarantees to obtain financing through another lender. In fact, only two members of Rock Ivy had signed personal guarantees of the SunTrust notes, while all individual members of Linked and RC Properties were personally liable.

Finally, holding the property may have created an even more unfortunate result since there were no other offers to purchase the land, the real estate market was in serious decline and the value of the property may have declined with the market. In light of these factors, RC Properties and Linked made the decision to sell the property to Vanguard.

(b) The Negotiations, Structure and Disclosure to Members

All members were continually updated on matters regarding the negotiations with Vanguard as evidenced by several emails between the members. Moreover, during the negotiations, Rock Creek had legal counsel; Huntly Gordon, a member of Rock Ivy, was an attorney engaged in real estate law; and Ed Gratz, another member of Rock Ivy, had his own legal counsel during the process. Although several members of Rock Ivy testified as to the hostility created by the negotiations and their desire for greater communication, all individual members were aware of the material facts during these negotiations.

The proposed sale to Vanguard included the Harrison Farm that was separately owned by Ingram and Sohr, and Rock Ivy argues that the inclusion of the Harrison Farm in the sale is evidence of inherent

unfairness. As the trial court correctly found, the inclusion of the Harrison Farm created a conflict of interest for Ingram and Sohr; however, as they explain and Vanguard acknowledged, it was Vanguard that insisted on including the Harrison Farm in the sale. Ingram and Sohr also insist that Rock Ivy produced only minimal evidence to suggest that including the Harrison Farm in the transaction detracted from or diminished the value Rock Creek received for the East Side Tract, relying on the unsupported opinion of Rock Ivy member Tom Parkinson, who stated: "I felt that the Harrison Farm had nothing done to it ... it detracted from the value of our land in connection with this contract." However, no one testified that Vanguard would have paid more for the East Side Tract had the Harrison Farm been removed from the transaction, and to the contrary, it was Vanguard that insisted on including the farm.

The trial court also noted that all members of Rock Creek, and their respective individual members, were fully aware of the negotiations with Vanguard as they occurred and had the opportunity to comment, express concerns, objections and/or approvals. Further, the court noted that when the proposed contract with Vanguard came to a vote, all members were present and participated in the vote to approve the contract with Vanguard.

Given these facts, the evidence does not preponderate against the trial court's finding of fair dealing by Sohr, Ingram, and RC Properties.

## 2. Fair Price

■ The second component of the "entire fairness" test is fair price, which "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects,

and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711. "When conducting a fair price inquiry as part of the entire fairness standard of review, the court asks whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'" *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 466 (Del.Ch.2011) (internal citations omitted). Here, we agree that the price was fair under the circumstances.

Rock Ivy contends that the final sale price was not fair in the context of FUM's unfair dealing, rather than arguing straightforwardly that the price was not fair. Although Rock Ivy tries to couch its argument of unfair price as pertaining to unfair dealing, we will examine it under the aspect of fair price, since that is what the doctrine requires.

Specifically, Rock Ivy argues that appraisals done before and after the sale evidence the unfairness of the transaction. In May and October 2008, and again post-contract in July 2009, the East Side Tract was appraised at values over $20,000 per acre; however, all appraisals included a holding period of over two years in order to market the property. Under the contract, the land sold for $11,637.63 per acre. Despite these high appraisal values, Rock Creek did not find a buyer willing to pay these prices. In fact, even though the West Side Tract was more readily developed than the East Side Tract, the West Side Tract did not sell despite being listed with a broker in 2009. Moreover, the broker who listed the West Side Tract opined when asked that Rock Creek should consider an offer for $10,000 per acre for the East Side Tract if such a buyer could be found.

Additionally, two of Rock Ivy's members, specifically Ed Gratz and Tom Parkinson, testified that reasonable minds could differ as to the price offered by Vanguard, thereby satisfying the test of fair price. *Reis,* 28 A.3d at 466.

Finally, Rock Ivy argues that TVA's offer to purchase a portion of the East Side Tract for approximately $28,500 per acre also indicates unfair dealing. Rock Ivy states that these proceeds should have gone to Rock Creek; however, Vanguard insisted on receiving those proceeds and the trial court found that "any purchaser of the acreage would expect to be paid for the effect of the TVA easement on a residential development," and we agree.

As stated above, the concept of a fair price relates to the economic and financial considerations of the transaction, including relevant factors such as assets, market value and future prospects, if any. *Weinberger,* 457 A.2d at 711. Having considered the relevant factors, we have concluded that the evidence in this record does not preponderate against the trial court's finding that a fair price was obtained; thus, we affirm this finding.

Having affirmed the trial court's findings of fair dealing and fair price, we affirm the trial court's conclusion that the contract of sale of the East Side Tract to Vanguard was fair to Rock Creek; thus, the transaction with Vanguard is neither void nor voidable by Rock Creek or its members.

### C. ALLEGED BREACHES OF STATUTORY AND CONTRACTUAL DUTIES

In its Amended Complaint, Rock Ivy asserted that Sohr and Church, as officers of Rock Creek, breached their fiduciary duties under the terms of the Operating Agreement and Tenn.Code Ann. § 48–249–403(j), alleging, inter alia, that Sohr breached his duties as President by forming FUM, approving the sale of the East Side Tract for an amount below market value, and selling the Harrison Farm in conjunction with the sale, and also alleging, inter alia, that both failed to pursue alternative financing, failed to recover TVA condemnation proceeds, and failed to perform due diligence in connection with the sale. Pursuant to Section 9.5 of the Operating Agreement, the standards of conduct of Rock Creek's officers are those set forth in Tenn.Code Ann. § 48–249–403.[8] The statute detailing the standard for officers provides as follows:

> OFFICERS. An officer of an LLC shall discharge all duties as an officer: (1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner the officer reasonably believes to be in the best interest of the LLC.

Tenn.Code Ann. § 48–249–403(j) (2012).

The trial court dismissed this claim as to both Sohr and Church. The court's reasoning was that Sohr and Church's duties as officers of Rock Creek were merely "ministerial" because Rock Creek was member-managed; it also reasoned that the Operating Agreement limited the officers' authority to act for the entity. Specifically, the first sentence of Article VI states that, "All powers of the company shall be exercised under the authority of, and the business and affairs of the company shall be managed under the direction

---

**8.** The Operating Agreement expressly references Tenn.Code Ann. § 48–249–403(i), which details the standards for a *director*-managed LLC. The parties do not dispute that Rock Creek is a *member*-managed LLC, and that Sohr and Church are both officers of Rock Creek. Therefore, we shall look at the standard for *officers,* as provided in subsection (j).

of, the *members.*" (Emphasis added). Moreover, Section 8.9 of the Operating Agreement expressly limits the authority of officers by stating that, "Nothing contained in this article shall be construed as giving the officers any authority over the management of the company."

Relying on these provisions of the Operating Agreement, the trial court found that neither Sohr nor Church violated any duty imposed by Tenn.Code Ann. § 48–249–403(j) in connection with the sale, failure to pursue financing, or FUM's purchase of Rock Creek's outstanding indebtedness. The trial court made its determination "[b]ecause Rock Creek was member-managed and because the Operating Agreement itself states that neither the president, nor the vice president, nor the secretary, nor the treasurer are going to be making decisions about policy or making decisions that are anything except ministerial." The trial court further explained that although the President had more discretion in managing the business, during the meetings discussing the capital call and the sale to Vanguard, all members were present and were entitled to vote. Sohr and Church did not make decisions on behalf of the members regarding those votes; thus, the trial court found no violation of a fiduciary duty. Moreover, the trial court found that all the members of Rock Creek were aware that FUM was owned by Ingram and Sohr before any action was taken in regards to acting on the loan. RC Properties and Linked decided they did not want to finance Rock Ivy's position in Rock Creek, and none of the individual members were required to buy Rock Ivy's interest or make Rock Ivy's capital contribution.

Rock Ivy also asserts that the trial court failed to apply the contractual and statutory duties of loyalty and care under the Operating Agreement and Tenn.Code Ann. § 48–249–403. Rock Ivy also argues that the trial court erred in granting summary judgment on the reinvestment provision as it relates to the officers' breach of fiduciary duties. We shall address Rock Ivy's arguments in turn.

Under Tenn.Code Ann. § 48–249–401(a), in a member-managed LLC, each member has equal rights in the management and conduct of the LLC's business. The only fiduciary duties a member owes to a member-managed LLC and the LLC's other members and holders are the duty of loyalty and the duty of care. Tenn.Code Ann. § 48–249–403 (2012).

### 1. Duty of Loyalty in a Member–Managed LLC

A member's duty of loyalty is outlined in Tenn.Code Ann. § 48–249–403:

(b) Duty of loyalty. A member's duty of loyalty to a member-managed LLC and the LLC's other members and holders of financial rights is limited to the following:

(1) To account to the LLC and to hold as trustee for it any property, profit or benefit derived by the member in the conduct or winding up of the LLC's business, or derived from a use by the member of the LLC's property, including the appropriation of any opportunity of the LLC;

(2) Subject to § 48–249–404, to refrain from dealing with the LLC in the conduct or winding up of the LLC's business as, or on behalf of, a person having an interest adverse to the LLC; and

(3) To refrain from competing with the LLC in the conduct of the LLC's business before the termination of the LLC.

■ First, Rock Ivy contends that Sohr, as President, breached his duty of loyalty when he placed himself in a preferential position over Rock Creek by founding FUM to acquire the debt owed by Rock Creek. We note, however, that this fact, without more, is insufficient because Tenn. Code Ann. § 48–249–403(f) allows members of a member-managed LLC to loan money to the LLC.

> (f) Dealings with LLC. A member of a member-managed LLC may lend money to and transact other business with the LLC. As to each loan or transaction, the rights and obligations of the member are the same as those of a person who is not a member, subject to other applicable law.

Tenn.Code Ann. § 48–249–403(f)(2012).

Moreover, two members of Rock Ivy testified that the purchase of FUM by Ingram and Sohr benefitted Rock Creek by giving the company more time to find a buyer.

■ Second, Rock Ivy asserts that Sohr also breached his duty of loyalty when he proposed and pursued the sale to Vanguard despite his membership in FUM and ownership in the Farm. We also find this argument unpersuasive because "[a] member of a member-managed LLC does not violate a duty or obligation under this chapter or under the LLC documents, merely because the member's conduct also furthers the member's own interest." Tenn.Code Ann. § 48–249–403(e).

Neither Rock Ivy nor anyone else produced a buyer who was willing and able to buy enough of Rock Creek's assets to pay off its debt; even the utilization of a broker was unproductive. Moreover, it was undisputed that Sohr began negotiations with Vanguard prior to the purchase of the notes, which was additionally supported by several emails offered into evidence.

■ As for the individual claims against Church for breach of loyalty, Rock Ivy contends that Church supported the sale to Vanguard despite his knowledge of Sohr and Ingram's conflict of interest and the gross disparity between the appraisal value and the ultimate sale price. In support of its contention, Rock Ivy produced emails between Church and Ennis, the other member of Linked, in which Ennis expressed concerns to Church about the contract. However, both members of Linked attended the meeting in which Rock Creek voted to approve the sale, and Linked voted to approve. All members of Rock Creek were aware of the conflict of interest, and, although Church and Ennis were not enthused about the sale price, it was far superior to any alternative. Furthermore, and most importantly, Church, as a member of Linked, had no conflict of interest because he did not have an interest in either FUM or the Harrison Farm.

Based upon the above and other evidence, the trial court found that Sohr and Church did not violate the duty of loyalty. Having reviewed the record, we have concluded that the evidence does not preponderate against the trial court's finding. Accordingly, we affirm the finding that Sohr and Church did not violate the duty of loyalty to Rock Creek.

### 2. *Duty of Care in a Member-Managed LLC*

Rock Creek's Operating Agreement limits the duties of the officers and specifies that the authority to manage the LLC is placed directly in the members, not the officers. Further, the Tennessee Revised Limited Liability Company Act limits the duty of care of officers in member-managed LLCs. *See* Tenn.Code Ann. § 48–249–403(c) (2012). "A member's duty of care to a member-managed LLC, and the LLC's other members and holders of fi-

nancial rights ..., *is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.*" *Id.* (Emphasis added).

(a) Sohr's Duty of Care as President of Rock Creek

 Rock Ivy contends that Sohr violated his duty of care as president of Rock Creek by taking little action in marketing and selling its property until after FUM purchased the note, not performing due diligence or investigating alternatives to the price offered by Vanguard, and failing to recover the TVA condemnation proceeds or the reinvestment provision. These allegations, and the modicum of evidence in the record on this issue, however, fall far from proving that Sohr engaged in any conduct that could be confused with grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

Sohr listed the West Side Tract with a broker and began negotiations with Vanguard before FUM purchased the notes from SunTrust. The listing produced no buyers and the downward trend of the real estate market highly impacted the ability to attract any potential buyers other than Vanguard. Moreover, the alternatives suggested by Rock Ivy (as discussed in the above section) did not produce as favorable a result as the sale to Vanguard. No one produced a willing buyer during this time for a price above the final contract price offered by Vanguard. Further, it was Vanguard, who was the only prospective buyer, that insisted upon receiving the TVA proceeds and it was Vanguard that unilaterally retracted the reinvestment provision when Rock Ivy filed this action. Thus, Sohr, as president of Rock Creek, was faced with few options.

(b) Church's Duty of Care as Secretary/Treasurer of Rock Creek

 Rock Ivy also asserts that Church, as Secretary/Treasurer, violated the duty of care by failing to secure counsel for Rock Creek during the transaction and failing to recover the TVA condemnation proceeds or enforce the reinvestment provision. We find these allegations without merit.

Church's authority as an officer of Rock Creek was very limited, and there is no proof that he had unilateral authority to engage counsel for Rock Creek. Moreover, Rock Creek did in fact have counsel regarding the sale to Vanguard, as well as an attorney it consulted in regards to the TVA condemnation proceeds and Huntly Gordon, a member of Rock Ivy who was also a real estate attorney and who participated in the discussions. Further, it was Vanguard that insisted on the TVA proceeds, and there is no evidence that Church could have done anything to change the result.

As was the case with the claims against Sohr for breach of duty, there is no credible evidence in this record to support a finding that Church's conduct constituted grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law. Thus, there is no basis upon which to find that he violated his statutory duty of care. *See* Tenn.Code Ann. § 48–249–403(c) (2012).

We, therefore, affirm the trial court's finding that neither Sohr nor Church violated a duty of care to Rock Creek or its members.

## D. CIVIL CONSPIRACY

Rock Ivy asserted that Sohr, Church, Ingram, RC Properties, Linked, and FUM engaged in "concerted activity, each with intent and with the knowledge of the other's intent to sell the East Side Tract and

the unrelated [Farm] in order to pay off the FUM loans and profit themselves at the expense of Rock Ivy and Rock Creek." The trial court dismissed this claim, finding that "it does not see a conspiracy among any of the defendants to take an illegal action or an action that was ultimately unfair and adverse to Rock Creek" in regards to the land transaction, the failure to obtain financing, or FUM's purchase of Rock Creek's outstanding indebtedness.

On appeal, Rock Ivy contends the trial court erred when it failed to hold that RC Properties, Sohr, and Ingram participated in a civil conspiracy in regards to the conflict of interest land transaction.[9] Rock Ivy contends that through FUM, Sohr and Ingram pressured Rock Creek to approve a conflict of interest transaction that created a preferential payment to Ingram and Sohr, in violation of Section 3.6(d) of the Operating Agreement, which states, "No Member shall be entitled to priority over any other Member, either with respect to a return of its capital contributions, or to allocations of taxable income, gains, losses or credits, or to distributions."

■ The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn.Ct.App.2006) (citing *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 720 (E.D.Tenn.2001)). In its brief, Rock Ivy acknowledges that "the creation of FUM itself was not unlawful." Thus, its conspiracy claim is based on the assertion that the defendants' accomplished a lawful purpose by unlawful means.

■ Specifically, Rock Ivy contends that Ingram and Sohr, through FUM, conspired to purchase the note and pressured Rock Creek to sell the East Side Tract in order to receive a preferential payment of interest and fees. This contention, however, is undermined by Tenn.Code Ann. § 48–249–403(f) which expressly permits member-loans to an LLC. Moreover, section 3.6(a) of the Operating Agreement states that "[a]ny loan by a Member to the Company shall not be considered as a capital contribution to the Company," suggesting that the Operating Agreement implicitly allows members to extend loans to the LLC.

As for the issue of the notes being "fair" to Rock Creek, it is important to recognize that all members of Rock Creek approved the fairness of the notes when Rock Creek agreed to the notes and Deed of Trust with SunTrust, which have never been modified. The only change was the identity of the holder of the notes. More importantly, Huntly Gordon, a member of Rock Ivy and its chief manager who testified at trial, acknowledged that the terms of the SunTrust notes were fair. Further, Sohr, Ingram, and RC Properties repeatedly informed Rock Ivy and its members that the indebtedness on the notes to SunTrust needed to be satisfied, and only after their offer to purchase the note together was declined did Sohr and Ingram establish FUM and acquire the notes from SunTrust.

The evidence in this record does not preponderate against the trial court's findings that the means employed to acquire the notes from SunTrust were lawful nor does it preponderate against the finding that they did not employ unlawful means to cause the sale of the East Side Tract to Vanguard.

9. Rock Ivy does not appeal this claim against Linked or Church.

Because Rock Ivy cannot establish an essential element of a claim for conspiracy, we affirm the trial court's dismissal of the claim of conspiracy as to all defendants.

## II. ATTORNEYS' FEES IN DERIVATIVE ACTIONS

With the exception of Sohr's request for indemnification, which is addressed in another section, the issues regarding attorneys' fees are based upon Tenn.Code Ann. § 48–249–804, which pertains to derivative proceedings. The statute provides:

(a) DEFENDANT'S EXPENSES. On termination of the proceeding, the court may require the plaintiff to pay any defendant's reasonable expenses, including attorneys' fees, incurred in defending the proceeding, if it finds that the proceeding was commenced without reasonable cause.

(b) PLAINTIFF'S EXPENSES. If a derivative proceeding is successful in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of any such proceeding, the court may award the plaintiff its reasonable expenses, including reasonable attorneys' fees. If anything is so received by the plaintiff, the court shall make such award of the plaintiff's expenses payable out of those proceeds and direct the plaintiff to remit to the LLC the remainder of anything received, and if those proceeds are insufficient to reimburse the plaintiff's reasonable expenses, the court may direct that any such award of the plaintiff's expenses, or portion of the expenses, be paid by the LLC.

Tenn.Code Ann. § 48–249–804 (2012).

■ Because the statute explicitly uses the word "may," the trial court has the discretion whether to award attorney's fees based upon the contingency that the court find the proceeding was commenced

without reasonable cause. *Compare* Tenn. Code Ann. § 48–249–804, *with* Tenn.Code Ann. § 48–17–401(d) (In shareholders' derivative actions, "the court *may* order … [t]he plaintiff to pay any defendant's reasonable expenses, including counsel fees, incurred in defending the proceeding, *if the court finds that the proceeding was commenced or maintained without reasonable cause….*") (emphasis added) *and Brady v. Calcote,* No. M2003–01690–COA–R3–CV, 2005 WL 65535, at *6 (Tenn.Ct. App. Jan. 11, 2005) (awards of attorneys' fees under the derivative statutes are made in the trial court's discretion). Therefore, the abuse of discretion standard applies.

Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001) (internal citations omitted). A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." *Id.* The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Id.* We will address each party's issues on appeal regarding attorneys' fees and expenses in turn.

The trial court awarded attorneys' fees to Linked against Rock Ivy, while also ordering Rock Creek to reimburse Church his fees and expenses to the extent that Linked could not recover its fees from Rock Ivy; declined to award Ingram fees pursuant to the statute; and declined to award Gordon fees and expenses pursuant to the same statute.

### A. LINKED'S CLAIM FOR ATTORNEYS' FEES

■ After the trial court dismissed all of Rock Ivy's derivative claims against

Linked, the court ruled that Linked was entitled to recover its attorneys' fees and expenses from Rock Ivy pursuant to Tenn. Code Ann. § 48–249–804(a) and awarded a judgment of $193,285.69 against Rock Ivy.

Rock Ivy alleges the trial court incorrectly applied Tenn.Code Ann. § 48–249–804 in awarding attorneys' fees to Linked against Rock Ivy.[10] Rock Ivy contends the trial court did not make a finding that this action was commenced without reasonable cause, as required by the statute; moreover, Rock Ivy insists it had reasonable cause to file its claims against Linked.

■ In the context of a derivative action, a plaintiff acts without reasonable cause "if, at the time the plaintiff brings suit: (1) plaintiff's claims in the lawsuit are not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; or (2) plaintiff's allegations in the suit are not well grounded in fact after reasonable inquiry." *Brady v. Calcote*, No. M2003–01690–COA–R3CV, 2005 WL 65535, at *8 (Tenn.Ct.App. Jan. 11, 2005)[11] (citing *Bass v. Walker*, 99 S.W.3d 877, 885 (Tex.App. 2003); Model Bus. Corp. Act § 7.46(3) (1999)).

Rock Ivy's contentions notwithstanding, we find it implicit in the trial court's ruling that Rock Ivy's claim against Linked was brought without reasonable cause. The trial court found that,

> Linked, and Mr. Church as an officer of Linked, voted in the interest-in it's own self-interest-[which] is reasonable and acceptable and recognized under statutes as a proper consideration and activity. And Linked voted in favor of the best interest of Rock Creek as Linked saw it, and the Court thinks Linked was reasonable in that regard.

Moreover, Linked had no interest or ownership in FUM or the Harrison Farm, and Linked had no conflicts of interest, unlike Ingram and Sohr. Thus, the trial court found that there was reasonable cause to bring claims against Ingram and Sohr because of their conflicts of interest but no conflict as it pertained to Linked.

Based upon the evidence in this record, we find no abuse of discretion in the trial court's decision to hold Rock Ivy liable for Linked's attorneys' fees and expenses.

### B. INGRAM'S CLAIM FOR ATTORNEYS' FEES

■ The trial court denied Ingram's request to recover $158,610.92 in attor-

---

**10.** Rock Ivy also contends that the trial court erred in declining to award Rock Ivy attorneys' fees against FUM pursuant to Tenn. Code Ann. § 48–249–804(b) for successfully defending FUM's Third–Party Complaint. This issue, however, is now moot because we find that FUM is entitled to those fees, as discussed below.

**11.** The specific statute at issue in *Brady* was Tenn.Code Ann. § 48–17–401(d), which addresses proceedings in shareholder derivative actions. We find it persuasive because that statute mirrors the language of Tenn.Code Ann. § 48–249–804. Tennessee Code Annotated § 48–17–401(d), states in pertinent part:

. . .

(d) On termination of the proceeding, the court *may* order:

(2) The plaintiff to pay any defendant's reasonable expenses, including counsel fees, incurred in defending the proceeding, *if the court finds that the proceeding was commenced or maintained without reasonable cause or for an improper purpose;* or

(3) A party to pay an opposing party's reasonable expenses, including counsel fees, incurred because of the filing of a pleading, motion or other paper, if the court finds that the pleading, motion or other paper was not well grounded in fact, after reasonable inquiry, or warranted by existing law or a good faith argument for the extension, modification or reversal of existing law and was interposed for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation[.]

neys' fees and expenses pursuant to Tenn. Code Ann. § 48–249–804. On appeal, Ingram argues that the trial court erred in denying Ingram's request because Rock Ivy's claim against him was meritless and without reasonable cause.

Rock Ivy, individually and derivatively as Rock Creek, asserted claims against Ingram for conspiracy and breach of fiduciary duty resulting from a conflict of interest transaction. Ingram argues that he can neither be held liable under the conflict of interest statute, Tenn.Code Ann. § 48–249–404, because he was not a member, manager, director, or officer of Rock Creek, nor for civil conspiracy because he cannot be liable for the predicate tort of a conflict of interest transaction.

The trial court found that the claims against Ingram had merit because of his conflict of interest as a principal of FUM, owner of the Harrison Farm, and as an individual member of RC Properties. We agree because Ingram's many and varying interests place him in conflict regarding the sale of the Harrison Farm in conjunction with the East Side Tract as well as the notes, due in part to his interest in FUM, which placed himself in conflict with Rock Creek. Because of these factors, we find no abuse of discretion with the trial court's findings that Rock Ivy had reasonable cause to initiate these claims when they were commenced. Therefore, we affirm the denial of Ingram's claim for attorneys' fees and expenses pursuant to the derivative statute.[12]

## C. HUNTLY GORDON'S CLAIM FOR ATTORNEY'S FEES

■ RC Properties asserted a derivative Third–Party Complaint against Huntly Gordon individually, asserting that Gordon, as an officer of Rock Ivy, breached Tenn.Code Ann. § 48–249–403, which sets the standards of conduct for members, managers, directors and officers of LLCs. Subsequently, all claims against Gordon were voluntarily dismissed by RC Properties. Thereafter, Gordon filed a Post–Trial Request for Attorney's Fees and Expenses asserting that the third-party claim was brought without reasonable cause, thus entitling him to attorney's fees from RC Properties under the indemnification provisions of Rock Creek's Operating Agreement as well as Tenn.Code Ann. § 48–249–804. The trial court denied this request upon the findings that there was no reference in the Third–Party Complaint to any role Gordon had in Rock Creek, and that Gordon failed to assert a Counter-Claim or request for attorney's fees in his third-party answer or any other pleadings before the claim was voluntarily dismissed.

On appeal, Gordon argues that the trial court erred in denying him attorney's fees and expenses pursuant to Tenn.Code Ann. § 48–249–804 because, he contends, RC Properties sued him under Tenn.Code Ann. § 48–249–403, and it knew or reasonably should have known that he, Gordon, was not a member, manager, director, or officer of Rock Creek; therefore, no reasonable cause existed to bring suit under the statute. For its part, RC Properties contends that Gordon was sued as both an officer of Rock Ivy and as an individual, but not as an officer of Rock Creek.

The trial court agreed with RC Properties finding that Tenn.Code Ann. § 48–249–804 and the indemnification provisions in the Operating Agreement did not apply because Gordon was not sued as an officer of Rock Creek. Further, the trial court

---

**12.** As we discussed elsewhere, the legal standards upon which a party may recover his attorney's fees under the derivative statute are vastly different from an officer's entitlement to recover his attorney's fees under an indemnification provision with his LLC.

made no finding that the proceeding was brought without reasonable cause.

Based upon the foregoing, we find no abuse of discretion in the trial court's decision to deny Gordon's claims for attorney's fees and expenses under the statute or the Operating Agreement.

### D. CHURCH'S CLAIMS FOR ATTORNEYS' FEES

 The trial court awarded Church, in his capacity as officer of Rock Creek, attorneys' fees and expenses against Rock Creek pursuant to the Rock Creek Operating Agreement. The court also awarded Church a conditional judgment under indemnification pursuant to Tenn.Code Ann. § 48–249–115, but only to the extent that Linked was unable to recover its fees from Rock Ivy.

Ingram and FUM contend the trial court erred in ordering Rock Creek to reimburse Church $96,285.69 in attorneys' fees and expenses because Church admitted that he did not pay any attorneys' fees, and he does not owe such fees and expenses.

The trial court found that all the attorneys' fees and expenses for both Linked and Church were paid by Linked. In the order awarding Church his fees, the trial court noted that "Church is one of Linked's two members, and Church was impacted financially, albeit indirectly, via his contributions to Linked." The court also noted that Linked paid the fees and expenses through Church's contributions, and thus, Church should be entitled to indemnification *in the event* Linked is unable to recover its fees from Rock Ivy. We find no error with the court's provisional award, and thus, we affirm the trial court's provisional award of fees to Church.

### III. DEFAULT INTEREST UNDER THE NOTES

As the holder of the notes owed by Rock Creek, FUM claimed it was entitled to recover "default interest" accruing after notice of default was given to Rock Creek as well as its attorneys' fees. The trial court denied both requests on the ground that FUM "was used as an instrumentality or business conduit for RC Properties." More specifically, the trial court relied on the fact that Sohr and Ingram were owners of both FUM and RC Properties, and concluded that FUM was used "as an instrumentality or business conduit for another corporation." The court additionally employed the doctrine of piercing the corporate veil to find it inequitable for Sohr and Ingram to indirectly collect through FUM default interest and attorneys' fees from Rock Creek.

 When applicable, factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities. *Pamperin v. Streamline Mfg., Inc.,* 276 S.W.3d 428, 438 (Tenn.Ct.App.2008).

 *Pamperin,* however, also stands for the principle that "[p]iercing the corpo-

rate veil is an equitable doctrine applied in extreme circumstances to prevent the use of a corporate entity *to defraud or perform illegal acts." Id.* at 437 (emphasis added).

■ To the contrary, the trial court stated that it "did not find that any party was involved in fraud, lying, [or] crimes." Nevertheless, the trial court noted that "FUM was used in a conflict of interest situation to achieve—and the achieving of default interest here ... is an inequitable result." We have already determined that the various provisions of the notes, which were agreed upon by Rock Creek and its members when the funds were borrowed from SunTrust, are fair to Rock Creek. This is because the notes were negotiated with a third-party lender in an arms-length transaction. More than two years later, FUM purchased the notes from Sun-Trust, a transaction that benefitted Rock Creek in that Rock Creek and its members were given more time to obtain other financing or to find a buyer in lieu of foreclosure or suits on the personal guarantees. Thus, it cannot be said that Sohr and Ingram's purchase, by means of FUM, of the notes from SunTrust was inequitable to Rock Creek. Moreover, FUM's acquisition of the notes from SunTrust was neither fraudulent nor an illegal act. *See Pamperin,* 276 S.W.3d at 437.

For the above reasons, and having examined the facts in the context of *Pamperin* and other relevant corporate principles, we are unable to conclude, as the trial court did, that Sohr and Ingram's use of FUM to purchase the delinquent notes from SunTrust or to exercise the rights and privileges of the holder of the note justify piercing the corporate veil of FUM. However, as the trial court correctly found, the purchase of the notes by FUM created a conflict of interest for Sohr and Ingram; therefore, we must determine whether the fact that FUM was the holder

of the notes and its subsequent actions were fair to Rock Creek and its members. Tenn.Code Ann. § 48–249–404(a)(3) (2008); *see also Marciano v. Nakash,* 535 A.2d 400, 404 (Del.1987) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous fairness of the bargain.").

■ Rock Creek's Operating Agreement allows its members to make loans to the company, as discussed above; thus, the fact that Sohr and Ingram, through FUM, are holders of the notes owed by Rock Creek does not violate any right owing to Rock Creek or its members. Further, if SunTrust still owned the notes, or if any third party was the holder of the notes, the holder would be authorized to impose default interest and penalties once the notes were in default. That is exactly what FUM did, and no one contends that the notes were not in default when so declared by FUM or at anytime thereafter. Based upon these facts and the fact that Sohr and Ingram, through RC Properties, timely contributed their proportionate share of the capital call, and thereafter repeatedly attempted to fashion alternatives to paying off the indebtedness when it was owed to SunTrust, including proposing that the members of Rock Creek jointly pay off the note, we have concluded that the actions taken by FUM after its acquisition of the notes from SunTrust have been fair to Rock Creek and its members. Because any other holder of the notes could have, and most likely would have, sought to recover default interest and penalties, we find no equitable justification to prohibit FUM from recovering what any other holder of the notes would seek to recover.

Therefore, we respectfully reverse the trial court's ruling as it pertains to enforcement of the notes held by FUM and hold that FUM is entitled to recover default interest as specified in the notes.

Furthermore, FUM is entitled to recover its reasonable and necessary attorneys' fees, those incurred in the trial court and on appeal, to the extent they pertain to the enforcement of its rights and remedies arising from Rock Creek's default. Accordingly, we remand these issues to the trial court so that it may make the appropriate awards and enter judgment accordingly.

### In Conclusion

The judgment of the trial court is affirmed in part, reversed in part, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellants Rock Ivy Holding, LLC, and Rock Creek Development, LLC.